2019 IL App (2d) 170110-U
No. 2-17-0110
Order filed December 6, 2019
Modified Upon Denial of Rehearing February 10, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14-CF-76 |
| | ) | |
| DEMITRI GREEN-HOSEY, | ) ) | Honorable Donald J. Tegeler, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hudson and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's plain-error argument concerning Rule 431(b) fails.  The sentencing statutes are not unconstitutional, facially or as applied to defendant.  The trial court did not abuse its discretion at sentencing.  Affirmed.

¶ 2    After a jury trial, defendant, Demitri Green-Hosey, was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and armed robbery (720 ILCS 5/18-2(a)(4) (West 2012)).  He was age 18 when he committed the crimes.  Further, the crimes were committed with a firearm and mandated consecutive sentencing.  Consequently, the trial court imposed a cumulative sentence of 105 years' imprisonment.  The court denied defendant's motion to reduce the sentence.

¶ 3    Defendant raises three overarching issues on appeal:  (1) the court committed plain error and a new trial is warranted because, in this closely-balanced case, it failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during jury selection; (2) his sentence should be vacated because the combination of statutory provisions mandating a *de facto* life sentence violates the rehabilitation clause of the Illinois Constitution (Ill. Const. 1970, art. 1, § 11) and is, therefore, unconstitutional, both on its face and as applied to him; and (3) the court both misunderstood and abused its discretion when it imposed a 105-year aggregate sentence and, therefore, this court should reduce his sentence to the 76-year minimum (under which, due to truth-in-sentencing, he would be eligible for parole after serving 71 years).  For the following reasons, we affirm.

¶ 4                                I. BACKGROUND

¶ 5    On January 13, 2014, defendant and his older brother, Jaquan (age 20), telephoned Ari Williams (age 20), and arranged to purchase one ounce of marijuana for $300.  The three met at La Torta, a Mexican restaurant in Aurora and proceeded to a back hallway near a bathroom. Defendant shot and killed Williams.  Witnesses testified that the brothers ran out of the restaurant, and Williams was found on the floor in the back hallway.  He was taken to a hospital, where he was pronounced dead.  The forensic pathologist testified that Williams died from a gunshot wound to the back of the head inflicted at close-range, *i.e.*, within 24-inches or less.

¶ 6    After running out of the restaurant, the brothers proceeded to the Fox River and defendant disposed of the weapon.  They then returned to an apartment on Lake Street, where defendant washed himself with bleach (to remove gunpowder), shaved his head, and broke the phone they had used to arrange the meeting with Williams.  Their sister, Jasmine, found them in her apartment, and they paid her to drive them to Joliet.  In the car, defendant said, "Damn man, damn," and he called his mother and said, "I love you mommy, I love you.  I fucked up mommy.  I love you."

The brothers proceeded to a motel in Cicero, where they spent the night. They were arrested the next day, trying to board a train. Jaquan was found in possession of the marijuana and $373 cash.

¶ 7    The brothers were both charged with two counts of murder, felony murder predicated on robbery, and armed robbery. All charges against defendant alleged that he personally discharged the firearm that proximately caused Williams's death.[1]

¶ 8    At the time of his arrest, Jaquan told police that the gun was defendant's and that they had only planned to take the marijuana and run. However, the parties stipulated that, on August 23, 2016, Jaquan told two assistant State's Attorneys that there was *not* a plan to rob Williams. Rather, he stated that, when he began to pay for the marijuana, defendant pulled out a handgun, stated "[w]e ain't paying for anything," and shot Williams in the back of the head.

¶ 9                                    A. Trial

¶ 10   Trial commenced on August 30, 2016, with the primary disputed issue being whether defendant acted in self-defense. Jaquan testified that he and defendant called Williams because they wanted to buy some marijuana; they decided that, instead of paying for it, Jaquan would take the marijuana and flee, while defendant blocked Williams to facilitate the escape. Jaquan testified that, consistent with the plan, Williams showed them the marijuana, he showed Williams the

---

[1] On February 22, 2016, the State reached a deal with Jaquan, wherein he would enter an open guilty plea to the four charges, with sentencing to be continued indefinitely, and he would testify against defendant. In exchange, once defendant's case reached final judgment, the State would vacate Jaquan's conviction and add a new count to the indictment, charging first-degree murder without a firearm enhancement. Jaquan would then plead guilty to the new charge and receive an agreed 25-year sentence.

money, and then he pushed Williams, grabbed the drugs, and started to leave. However, he then heard a gunshot. When he turned around, Jaquan saw defendant holding a gun. He did not see the shooting itself or what happened right before it. Jaquan testified that the time between grabbing the drugs and hearing the gunshot was not long, but he did not hear anything else in the interim. When he turned around after hearing the gunshot, Williams was between him and defendant.

¶ 11 Jaquan testified that he did not bring a scale to the restaurant to weigh the drugs (nor was one ultimately recovered). Further, he testified that he did not know that defendant was bringing a gun to the drug purchase and that he recognized the gun because he saw defendant with it one week prior to the shooting. Jaquan admitted that he previously told the State that there was no plan to commit a robbery, but he denied telling the State that defendant pulled a gun or that he said "we ain't paying for anything."

¶ 12 Defendant, in contrast, testified that he shot Williams in self-defense. Specifically, defendant testified that he did not bring a gun to the drug purchase. He, Jaquan, and Williams went to the restaurant bathroom so that he and Jaquan could buy marijuana. Jaquan weighed the drugs on a scale he had brought, and it weighed less than one ounce; according to defendant, Jaquan was angry and he picked up the drugs and scale and started to back up. Defendant saw Williams pull out a gun from his waistband. Defendant did not yell out for his brother, or at all, that Williams had a gun. He reached for the gun, touching Williams's hand as he did so. The gun fell onto the floor. "We were pushing each other, trying to get to the gun." Defendant was pushed toward the gun; he picked it up and felt scared. He felt like it was "me or him." Defendant admitted that he shot Williams. When asked where he shot Williams, defendant stated that he did not know and that he "just shot." Defendant's subsequent actions (throwing the gun into the river, washing his body with bleach, cutting his hair, etc.) occurred, he explained, because he was scared

and did not want to go to jail. Defendant agreed that he did not tell his mother, when he called her, nor anyone else at any time, that Williams pulled a gun on him and that he had to shoot him in self-defense. He did not call an ambulance or the police.

¶ 13    As mentioned, the forensic pathologist opined that the gun was fired from within two feet. Further, she testified that the gunshot entered the back of Williams's head approximately one inch left of the midline, and that the wound track followed a straight path from the back left of the head to the front right. She could not ascertain, based upon the wound track, whether the bullet had been fired up or down, because it would depend upon the positioning of Williams's body. The autopsy did not disclose any injuries unrelated to the gunshot, but the pathologist testified that the absence of other injuries did not mean that no struggle took place.

¶ 14    The jury was instructed on self-defense and second-degree-murder. During deliberations, the jury asked for and received transcripts of Jaquan's and defendant's testimonies. The jury ultimately convicted defendant on all charges.

¶ 15                                B. Sentencing

¶ 16    At sentencing, the parties agreed with the court's initial statement that:

> "It's my understanding that Count 1 [first-degree murder] carries a sentence of 100 percent time in jail, and it's nonprobationable, 20 to 60, with an add-on of 25 years based upon the jury's verdict, and count 4 [armed robbery], Class X felony, carries a sentence of 6 to 30, with a 25-year add-on based upon the jury's verdict. That would be served at 85 percent, and the cases are to run consecutively."

¶ 17    In argument, the State explained that, for first-degree murder, "[b]etween the 20[-]to[-]60 sentencing range plus the 25[-]to[-]life add-on, that would mean a sentence on the first[-]degree murder in the *range of 45 years as a minimum to 85 to life as a maximum*." (Emphasis added.)

For armed robbery, the State similarly explained that the crime "has the initial sentencing range of 6 to 30 with a 25[-]to[-]life add-on, *making his range 31 years as a minimum and 85 to life as a maximum*." (Emphasis added.) The State asked that the court impose a sentence that was "more than the minimum."

¶ 18 Defense counsel commented that, "with 45 years as a minimum at 100 percent for murder and then 35 years at 85 percent as a minimum for the armed robbery, he's looking at a minimum sentence, Judge, of 71 years."

¶ 19 Defendant provided a statement in allocution, in part expressing that he was not asking the court for sympathy and, further, that " *** I would like to apologize to Arin Williams' family. I wish it never happened. If I could go back to that day and change things, I would. And I'm sorry. I truly am."

¶ 20 The trial court considered the statutory mitigating factors and found that none applied, although it commended defendant for apologizing and expressing sorrow. The court also recognized that there existed "very minimal" history of prior delinquency, no adult record, and no pending charges.

¶ 21 With respect to aggravating factors, the court found applicable the necessity to deter future crime, explaining:

"I must admit as the Court, and when I was practicing law, that this paragraph somewhat frustrates the Court. We have now been a nation for 240 years, I believe, if my addition is correct, and this paragraph has probably been in every criminal code for the last 240 years. And we have yet to prevent people from misusing guns. We have yet to prevent people from misusing drugs. We have yet to prevent people from thinking that they can take what isn't theirs when they want to and when they want to and how they want to. And

we have yet to prevent people from senselessly taking the lives of other individuals. Whether those individuals are innocent or not innocent people, they still deserve to be alive.

And yet somehow, some way, some day, hopefully it gets through to a bunch of young people that guns used inappropriately do kill. People deciding that they can make the rules in this society are wrong. Society has its rules, and they have their rules for a reason, and that is to protect people. And I hope that at some point we don't need this paragraph because we don't need to deter people from doing things. However, I do believe it is appropriate in this case."

¶ 22    The court stated that it was concerned that defendant had, in the court's estimation, at least three hours to realize that what he wanted to do was wrong, but at no point when walking into the restaurant to steal one ounce of marijuana "did he ever determine that he was going to change. And it's that thought process that really concerns this Court." The court found that defendant had shown no respect for Williams and his property, nor did he simply snatch the marijuana and run away. Instead, he pulled out a gun and shot him "two inches from the back of his head." The court commented that, while situations may arise where bad things happen in seconds, "that's not this case." The court found that it takes a "unique mind" to decide to effectuate the robbery as it happened and that it was that robbery and thought process that bothered the court more than anything else, because "that process says I have no respect for anyone but my own personal feelings. And when you lose respect for everyone else's feelings but yourself, you no longer deserve the right to walk in free society because that is a thought process that might never change."

¶ 23    The court noted that, if defendant had not brought a firearm to the robbery, he "quite frankly" would probably have been looking at between three and seven years' imprisonment. However, because he decided to take and use the firearm, the law required that the court add 25

years-to-life on each count, so that defendant was starting at 50 years' imprisonment. The court stated that, due to defendant's age and lack of criminal history, the *minimum* add-on of 25 years for using the gun was appropriate. Thus, on the murder charge, the court sentenced defendant to 35 years' imprisonment, plus 25 years for the add-on, for a total of 60 years to be served at 100 percent. For the armed robbery, the court sentenced defendant to 20 years' imprisonment, plus 25 years for the add-on, for a total of 45 years to be served at 85 percent. It ordered that the sentences be served consecutively (for a total of 105 years).

¶ 24    Defendant moved to reduce the sentence, with counsel arguing, in part, that the court did not consider certain mitigating circumstances (such as the fact that defendant had been homeless since age 14 and had received disability payments since age 6 for ADHD and mental issues). He further argued that the 105-year sentence violated the eighth amendment to the United States Constitution (U.S. Const. amend. VIII) and violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. 1, § 11). Defendant argued that, while one goal of sentencing was punishment, another was rehabilitation, *i.e.*, restoring defendants to useful citizenship. He argued that his sentence reflected *only* punishment, as 105 years' imprisonment constitutes a life sentence for an 18 year old with no criminal background.

¶ 25    On January 11, 2017, the court denied the motion. It disagreed that it did not consider defendant's rehabilitative potential and the entire pre-sentence report. The court noted that the mandatory add-ons meant that defendant would be sentenced to at least 50 years, and that the total minimum sentence available in this case would have been 76 years. The court noted that, although it agreed that the aggregate 105-year sentence constituted a *de facto* life sentence, it gave a sentence for each crime that it felt was appropriate, defendant was not a juvenile when he committed the

crime, and other courts have held that the add-ons and consecutive sentencing do not constitute cruel and unusual punishment.

¶ 26   Further, as to the rehabilitation clause, "I looked at [defendant's] family life.  I looked at his personal life, and it's not been a great personal life or family life; however, I did not have any evidence before me and I am using my common sense on this, I believe that at a young age everybody knows that it is absolutely improper, immoral, and a crime to take a gun, pull the trigger from about one foot, put a bullet in the back of somebody's head and kill them."  The court detailed the conscious and calculated decisions that defendant necessarily made when planning and committing these crimes, and it noted that defendant showed that he knew what he did was wrong when, "instead of sticking around and explaining himself as you would almost always [do] in a self[-]defense issue," ran, tried to disguise himself, and tried to get away with "what I consider an absolute execution of a human being."

¶ 27   The court further stated:

"[If defendant had been] age 50 or 60, he most likely would have gotten the maximum sentence in this case, because there would be no rehabilitating potential in this case.  In fact, [defendant] is a very young man, and I looked at his rehabilitative potential, and I sentenced him under the law [as to] what I thought was appropriate.  *I did not give him the maximum*.  Quite frankly, I *could never give him the minimum on this case*, *nor would I give him the minimum* based upon his actions of executing a human being.  That is the most heinous offense that anyone could possibly commit.  That young man never now has the chance to survive.  Therefore, the motion to reduce, reconsider, or vacate the sentence will be respectfully denied.  I believe that this court did take into account the rehabilitative potentials of  [defendant], and this Court was required also to add on the 25-

year sentence, which if I read the law correctly, I believe it could have been 25 to life in some instances. I gave him the minimum. I did not extend that out.

I do agree had he been under 18, I would be allowed to consider those 25[-]year add-ons and not give them in this case. He is not. I will follow the law, and I believe the sentence I gave him of 20 years on the armed robbery and 35 years on the murder are appropriate in this case. They protect society. They rightfully do punish [defendant] for his actions of executing a human being, but they also do take into account his family life, his age, and his ability to possibly rehabilitate himself while in prison."

¶ 28 Nevertheless, the court noted that it joined other courts in hoping that the legislature would reconsider sentencing schemes for young adults, particularly the mandatory add-ons and, in some circumstances, consecutive sentencing. In doing so, the court added, it urged the legislature to consider the research regarding brain development in young adults who are not legally juveniles. Moreover:

"I am *not saying that this is the case*, but I believe it is time for the legislature to take a look at the sentencing and allow the courts to attempt to formulate a sentence on a case-by-case basis and not handcuff the courts by requiring mandatory sentences that basically do give a *de-facto* life sentence.

I do not like the sentence that I have to give [defendant]; but, quite frankly, I am not the one that caused these issues. [Defendant] is. [Defendant] is the one who executed the gentleman. I am compelled by the law to sentence [defendant]. I did so [in] what I believe to be consistent with the law by taking into [account] not only the punishment factor but his rehabilitative potential in this case; and, therefore, the 105-year total sentence

will remain, 20 years for the armed robbery, 35 years on the murder case with a 25-year add-on to each case for a total of 105 years." (Emphasis added.)

¶ 29     Defendant appeals.

¶ 30                              II. ANALYSIS

¶ 31                              A. Rule 431(b)

¶ 32     Defendant argues first that the court failed to comply with Rule 431(b) during jury selection.   Specifically, during the jury selection process, the trial court generally informed the venire that defendant was presumed innocent of the charges, that the State had the burden of proving defendant's guilt beyond a reasonable doubt, and that defendant was not required to prove his innocence, nor present any evidence on his own behalf.   After the jurors were selected, the court informed the jury that it would next explain certain principles and, "if you understand those principles, agree with those principles and accept those principles, please do not raise your hand. That will signify that you understand, agree, and accept these principles.   If you don't understand or accept these principles or don't agree with them, I would ask that you raise your hand in response to my questions."

¶ 33     The court then stated that defendant is presumed innocent (first principle).   "Is there anybody here who has any difficulty or disagreement with this proposition of law, the presumption of innocence?   If so, please raise your hand."   No hands were raised.   The same process repeated for the principles that the State had the burden of proving defendant's guilt beyond a reasonable doubt (second principle), that defendant was not required to offer any evidence on his own behalf (third principle), and that defendant had a right to remain silent such that, if he did not testify, it could not be held against him (fourth principle).   No juror raised his or her hand when, between each principle, the court asked if anyone had "difficulty or disagreement with" the recited

propositions.

¶ 34    Conceding that he did not raise the issue below, defendant argues that the court committed plain error because it failed to properly ask the jurors whether they "understood" and "accepted" the four principles Rule 431(b) requires.  Defendant argues that we should not find his argument forfeited and that plain-error review is appropriate because the court's error is clear and obvious and the trial evidence was closely balanced.

¶ 35    The plain-error doctrine permits review of unpreserved error where the error is clear or obvious and: (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," (prong one) or (2) "th[e] error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence" (prong two).  *People v. Eppinger*, 2013 IL 114121, ¶ 18.  We first determine whether error occurred.  *Id. ¶* 19.  Here, defendant asserts reversible plain error only under prong one.  For the following reasons, we reject defendant's argument.

¶ 36    Rule 431(b) provides:

> "The court shall ask each potential juror, individually or in a group, whether that juror *understands and accepts* the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." (Emphasis added.) Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 37     Rule 431(b) "mandates a specific question and response process" (*People v. Thompson*, 238 Ill. 2d 598, 607 (2010)), such that the failure to ascertain whether the jurors both understand and accept the principles constitutes a violation of the rule and is error. *Id.*; see also *People v. Wilmington*, 2013 IL 112938, ¶ 32; *People v. Zehr*, 103 Ill. 2d 472, 477 (1984). The court here did not ask the jurors whether they understood and accepted each principle. Rather, it told them to *not* raise their hands if they understood and accepted, then asked them to raise their hands if they had "difficulty" or "disagreement" with each proposition. Indeed, in *People v. Dismuke*, 2017 IL App (2d) 141203, ¶¶ 53-55, this court found almost identical questions violated Rule 431(b). The State concedes that this court found the same procedure constituted error in *Dismuke*, but contends there was no plain error here because: (1) in *Wilmington*, the supreme court found it "arguable" that a court's asking for disagreement and getting none is equivalent to juror "acceptance" (*Wilmington*, 2013 IL 1112938, ¶ 32); (2) all the principles were included in the instructions the court issued before argument and deliberations; and (3) the evidence was not closely balanced.

¶ 38     While the State is correct that the court in *Wilmington* found arguable that asking for disagreement and getting none equates to "acceptance," it omits that the court also found that it would *not* satisfy the requirement to ensure that jurors "understand" the principle and, therefore, that error clearly occurred. *Id.* As such, *Wilmington* and *Dismuke* suggest that error occurred here, and we therefore presume error for the remainder of our analysis.

¶ 39    Thus, the question next becomes whether the evidence was so closely balanced that the error alone threatened to tip the scales of justice against defendant.  Defendant argues that the evidence was closely balanced, because the entire case came down to the credibility of Jaquan's version of events, which were offered after receiving a deal from the State, as compared to his own testimony that the shooting occurred in self-defense.  Citing, for example, *People v. Sebby*, 2017 IL 119445, ¶ 63 and *People v. Naylor*, 229 Ill. 2d 584, 607-08 (2008), defendant argues that evidence is closely balanced where the conviction rests solely on a credibility contest and where there is no evidence corroborating or contradicting either version of events.  Specifically, he notes that a pure credibility contest occurs when: (1) the prosecution and defense witnesses testify to opposing versions of events; (2) neither version is corroborated or contradicted by extrinsic evidence; and (3) both versions are "credible" or not "fanciful."  See *Sebby*, 2017 IL 119445, ¶¶ 61-63; *Naylor*, 229 Ill. 2d at 606-08.  However, we disagree that *Sebby* and *Naylor* are factually analogous or that both versions here were "credible."

¶ 40    *Sebby* presented a pure credibility contest because the defendant was charged with resisting a peace officer, the State offered testimony from three officers who claimed that the defendant had resisted, whereas the defendant and other witnesses claimed that the officers were yanking the defendant around.  The case further concerned whether the defendant's alleged resistance proximately caused the officer's injury.  *Sebby*, 2017 IL 119445, ¶¶ 54-58.  The court found that neither accounts were "fanciful," that the claims that the defendant's witnesses were biased bore no merit, each side's accounts were internally consistent, and there was no extrinsic evidence to corroborate either side.  *Id*. at ¶¶ 61-62.  Thus, the evidence was closely balanced and even a minor error could have tipped the scales because the "contest of credibility" at issue involved two equally credible, but opposing, accounts of the events.  *Id*. at ¶ 63.

¶ 41    In *Naylor*, a case involving the erroneous admission of a prior conviction, officers proceeded to an apartment stairwell, met with three individuals in the stairwell, and purchased drugs.  They left the building, transmitted descriptions of the individuals who sold the drugs, and other officers subsequently brought out the suspects from the building.  The officers testified that the defendant sold them the heroin, whereas the defendant testified that he had simply left his apartment to pick up his son from school when he was mistakenly swept up in the drug raid. *Naylor*, 229 Ill. 2d at 588-91.  The court found that the conviction turned on a "contest of credibility," as the defendant's testimony was consistent with much of the officers' testimony and the circumstances of the arrest, and no extrinsic evidence corroborated or contradicted either version. *Id*. at 607.

¶ 42    Unlike here, neither *Sebby* nor *Naylor* involved extensive "post-event" conduct by the defendants that shed light on the alleged crimes.  Rather, defendant undisputedly shot and killed Williams; he claimed that it was Williams's gun and that, after a brief struggle, he shot in self-defense.  Jaquan, in contrast, testified that he saw defendant with the gun one week before the shooting, and that, when he, Jaquan, grabbed the drugs and turned to run, he heard a gunshot (but no intervening struggle).  While we agree that the differing versions of the shooting itself might, alone, require credibility assessments, there also existed undisputed evidence concerning defendant's actions *after* the shooting, from which the jury was free to draw inferences. *Sebby* instructs that, "[i]n determining whether the evidence adduced at trial was close, a reviewing court must evaluate the *totality* of the evidence and conduct a qualitative, *commonsense* assessment of it within the context of the case. *** [The] inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." (Emphases added.) *Sebby*, 2017 IL 119445, ¶ 53.  Courts have found no "credibility

contest" when one party's version of the events was either implausible or corroborated by other evidence. See, *e.g.*, *People v. Olla*, 2018 IL App (2d) 160118, ¶ 35. Here, applying a commonsense analysis to the totality of the evidence in the context of this case, defendant's actions *after* the shooting do not credibly reflect that the shooting occurred in self-defense and, whether viewed as corroborating the State's theory or rendering his implausible, we disagree that the evidence concerned equally credible versions and was closely balanced.

¶ 43 Again, after the shooting, defendant did not tell anyone in the restaurant that someone had been shot, he did not call an ambulance or police, he fled Aurora, destroyed the cell phone used to schedule the drug deal, disposed of the weapon in a river, bleached his body, shaved his head, fled town, checked into a hotel under an assumed name, called his mother and told her that he "fucked up," and was arrested trying to board a train, while never telling *anyone* that he shot the gun in self-defense. This record evidence is not dependent on competing credibility concerns; it is undisputed and renders "less credible" defendant's version of events. We find support for our position in *People v. Blair*, 2011 IL App (2d) 070862, ¶ 42. There, the defendant also claimed that the court's Rule 431(b) instructions constituted plain error. He claimed that the evidence was closely balanced because the jury was tasked with deciding between his own testimony asserting self-defense and that of another witness, who claimed that the defendant started the altercation. This court disagreed, noting, in part, that the defendant had initiated a struggle from *behind* the victim, and that the defendant's conduct *after* the event was not consistent with an individual supposedly acting in self-defense. *Id.* at ¶ 43. Rather, the defendant did not call security or an ambulance, never contacted the authorities, and instead fled to a friend's house and eventually moved. *Id.*

¶ 44    Although *Blair* was decided before *Sebby*, it remains relevant to the extent that it reflects that defendant's own actions here after the shooting were not consistent with one who acted in self-defense. As the court later commented, rather than "sticking around and explaining himself," as would be consistent with a shooting committed in self-defense, defendant fled and tried to disguise himself. Without question, as defense counsel points out, it is not "implausible" to imagine that defendant panicked and, thus, fled the scene. However, that such a theory is *plausible* does not make closely balanced the *remaining* evidence as it speaks to a theory of self-defense. As in *Blair*, defendant here did not call authorities, an ambulance, or even alert anyone inside the restaurant that he shot a young man who lay dying on the hallway floor. Rather, he ran from the scene and took arguably sophisticated steps for a teenager with no criminal record, when he threw the gun in the river, broke the cell phone that was used to schedule the drug purchase, showered and shaved his head, bleached his body, fled town, checked into a motel under an assumed name, and was arrested trying to board a train. Yes, he was a teenager who, having killed someone during a drug deal, might have panicked. Indeed, defendant testified that he was, understandably, scared about going to jail. Nevertheless, the evidence of those actions still strongly suggests consciousness of guilt, as opposed to a justified shooting that occurred in self-defense. Critically, the pathologist's testimony reflects that the gunshot wound was to the *back* of Williams's head and from close range. Defendants notes that the pathologist testified that the absence of other injuries did not mean that no struggle occurred, and that she could not ascertain, based upon the wound track, whether the bullet had been fired up or down, because it would depend upon the positioning of Williams's body. Nevertheless, applying commonsense to the totality of the evidence in the context of this case, the gunshot wound to the back of the head from close range,

again, suggests the position of an aggressor (or executioner), as opposed to a shot fired off in self-defense. Simply put, the evidence was not closely balanced.

¶ 45    We note that this issue could have been easily avoided had the trial court inquired of jurors in language that specifically tracked Rule 431(b). The process utilized here did not shorten the inquiry or make it simpler, and the improvisation injected error into the record. The better practice is to use the specific language set forth in Rule 431(b). Nevertheless, as the evidence here was not closely balanced, defendant's plain-error claim fails. See, *e.g.*, *People v. Sims*, 192 Ill. 2d 592, 628 (2000). Accordingly, defendant's claim remains forfeited.

¶ 46                                B. Constitutionality of Sentence

¶ 47    Defendant argues next that the combination of statutes (mandatory minimums, firearm enhancements, mandatory consecutive sentencing, and truth-in-sentencing) that mandate his *de facto* life sentence is unconstitutional, both on its face and as applied to him. He notes that, once the jury returned its verdict, he faced a minimum sentence of 45 years for first-degree murder (the minimum 20 years on the murder charge, plus the 25-year add-on), and 31 years for armed robbery (the minimum 6 years for the armed-robbery charge, plus the 25-year add-on), for an aggregate of 76 years that must be served consecutively.[2] Under truth-in-sentencing, he will have to serve more

---

[2] See 730 ILCS 5/5-4.5-20(a) (West 2014) (term of imprisonment for first-degree murder shall be 20 to 60 years); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2014) (if, when committing first-degree murder, the defendant personally discharged a firearm that proximately caused death, 25 years or up to a term of natural life "shall be added to the term of imprisonment imposed by the court"); 730 ILCS 5/5-4.5-25(a) (West 2014) (term of imprisonment for a class X felony is 6 to 30 years) (720 ILCS 5/18-2(b) (West 2014) (an armed robbery in which the defendant personally

than 71 years (specifically, 71 years, 4 months, and 6 days) before even becoming eligible for release.[3]  Defendant asserts that this mandatory, 71-year *minimum* sentence did not permit any consideration of his extremely limited criminal history, his young age, other circumstances in his life, or his rehabilitative potential.  As such, defendant argues that the trial court had *no choice* but to impose a sentence that is functionally equivalent to life without parole.

¶ 48    Whether a statute is constitutional is a legal question to be reviewed *de novo*.  *People v. Taylor*, 2015 IL 117267, ¶ 11.  We begin with a presumption that a statute is constitutional and, because of this presumption, the party challenging the statute bears the burden of showing its invalidity.  See, *e.g.*, *People v. Miller*, 202 Ill. 2d 328, 335 (2002).

¶ 49                              1.  Facial Constitutionality

¶ 50    Defendant argues first that the sentencing scheme that mandates *de facto* life imprisonment is facially unconstitutional, as it permanently denies defendants any opportunity for rehabilitation and, accordingly, violates the Illinois Constitution's proportionate penalties clause, which requires the legislature, when fashioning a sentencing range, to take into account the objective of restoring the offender to useful citizenship.  Ill. Const. 1970, art. I, § 11.  Specifically, the proportionate-

---

discharges a firearm that proximately causes death is a Class X felony for which 25 years or up to a term of natural life "shall be added to the term of imprisonment imposed by the court"); 730 ILCS 5/5-8-4(d)(1) (West 2014) (the court shall imposed consecutive sentences if one of the offense is first-degree murder or a Class X felony and the defendant inflicted severe bodily injury).

   [3] See 730 ILCS 5/3-6-3(a)(2) (West 2014) (no sentencing credit applied to a term of imprisonment for first-degree murder; 4.5 days of sentencing credit applied for each month served on a term of imprisonment for armed robbery).

penalties clause to the Illinois Constitution provides: "[a]ll penalties shall be determined *both* according to the seriousness of the offense *and* with the objective of restoring the offender to useful citizenship." (Emphases added.) Ill. Const. 1970, art. 1, § 11. Defendant therefore asserts that the "statutory provisions setting the sentence for the offenses in this case, a knowing or intentional murder committed with a gun during an armed robbery," are facially unconstitutional because they reject section 11's "rehabilitation clause," *i.e.*, the constitutionally-mandated goal of rehabilitation.

¶ 51    Preliminarily, we note that defendant correctly points out that the State essentially failed to respond to his main argument. Indeed, defendant has conceded that *Miller v. Alabama*, 567 U.S. 460 (2012), and its eighth-amendment progeny concerning *juvenile* terms of imprisonment, do not technically apply to him because he was over age 18 when he committed his crimes. Rather, defendant's arguments focus on the Illinois Constitution's rehabilitation clause and the sentencing structure's confluence to preclude consideration of rehabilitation before entering a mandatory minimum sentence that equates to *de facto* life imprisonment. The State, however, focuses on applicability of juvenile-sentencing cases and does not directly address the crux of defendant's rehabilitation-clause argument. In any event, our review is *de novo*, and the State concedes that a sentence of 105 years' imprisonment, with a potential parole date only after 71 years of imprisonment, amounts to a *de facto* life sentence.

¶ 52    Defendant asserts that, "[t]he ultimate question is whether the very nature of the offenses involved here are such that the legislature could validly determine that there [is] no set of circumstances under which the offender should be given *the chance* to rehabilitate himself." (Emphasis added.) Defendant then argues that his conduct here, while serious, falls short of the conduct that *has* been found by courts to fall in the category justifying mandatory life sentences (*e.g.*, habitual offenders (*People v. Dunigan*, 165 Ill. 2d 236 (1995)), an adult who murders a child

(*People v. Wooters*, 188 Ill. 2d 500, 508-09 (1999)), someone capable of multiple murders (*People v. Amigon*, 239 Ill. 2d 71, 84 (2010)), or an offense that carries with it an unusually severe risk of recidivism (*People v. Huddleston*, 212 Ill. 2d 107 (2004))).

¶ 53    We reject defendant's argument that the combination of statutes that form the basis of his sentence is facially unconstitutional because the minimum sentence constitutes a life sentence without any consideration for rehabilitation.  A defendant raising a facial challenge must establish that the statute is unconstitutional under *any possible set of facts*.  *People v. Harris*, 2018 IL 121932, ¶ 38.  "[I]t is the province of the legislature to define offenses and determine the penalties required to protect society's interests." *People v. Williams*, 263 Ill. App. 3d 1098, 1104 (1994).  We are generally reluctant to override the judgment of the legislature with respect to criminal penalties.  See, *e.g.*, *People v. House*, 2019 IL App (1st) 110580-B, ¶ 42.  The legislature, not the courts, is in the best position "to investigate and ascertain the evils confronting society and gauge their seriousness." *Williams*, 263 Ill. App. 3d at 1104.  Further, "[t]he legislature's discretion necessarily includes the power to prescribe mandatory sentences, even if these mandatory sentences restrict the judiciary's discretion in imposing sentences." *Miller*, 202 Ill. 2d at 336.

¶ 54    Essentially, defendant's claim here is that no defendant who commits the crimes at issue has the *chance* for rehabilitation, because the aggregate sentence will always be a minimum of *de facto* life.  However, we conclude that defendant's facial challenge relies on a faulty premise, *i.e.*, that the mandatory minimum sentencing scheme does not inherently account for rehabilitative potential.  To the contrary, we presume that, when fashioning the sentencing ranges, the legislature *did* consider and balance the seriousness of the offense with the goal of rehabilitation for an offender who commits: (1) first-degree murder, using a firearm (45 years to life); (2) armed robbery, using a firearm (31 years to life); and (3) *both* crimes, using a firearm (76 years to life).

Moreover, our supreme court has noted that mandatory minimum sentences (albeit earlier versions of them) for first-degree murder and armed violence have been upheld against arguments that they violated the rehabilitation clause of section 11. See *People v. Taylor*, 102 Ill. 2d 201, 206-07 (1984) (citing *People v. Oestringer*, 24 Ill. App. 3d 185 (1974) (armed robbery) and *People v. Cantrell*, 14 Ill. App. 3d 1068, 1071-72 (1978) (murder)). Indeed, unlike the cases defendant cites where mandatory life imprisonment was triggered by certain heinous crimes or circumstances, defendant here did not receive "mandatory life;" he received a *de facto* life sentence because he committed two crimes in a certain manner that, combined, mandated a minimum lengthy term of years. Specifically, the minimum penalty for first-degree murder committed with the firearm is 45 years; this is not a life sentence for an *adult*, and, in his opening brief, defendant *concedes* that it balances the seriousness of the offense with the possibility of rehabilitation. See *People v. Thomas*, 2017 IL App (1st) 142557, ¶¶ 19, 27, 48 (courts reluctant to consider lengthy terms for an adult as *de facto* life sentences; moreover, the defendant's sentence, which included a 45-year sentence for murder with a firearm, was not unconstitutional for failure to consider rehabilitative potential).[4] Similarly, the minimum penalty here for armed robbery committed with the firearm

---

[4] Defendant asserts that our supreme court, *in People v. Buffer*, 2019 IL 122327, ¶ 42, determined that "any sentence longer than 40 years amounts to *de facto* life," and, although *Buffer* concerned a juvenile defendant, an adult who is sentenced to more than 40 years' imprisonment has even less of a meaningful opportunity to obtain release based on demonstrated rehabilitation and, therefore, the mandatory minimum sentence here constitutes a *de facto* life sentence. While this has some initial logical appeal, it is incorrect. The court's decision in *Buffer* was expressly based on the General Assembly's determination that, while certain factors for adult defendants

is 31 years; again, this is not a life sentence and one that defendant concedes balances the seriousness of the offense with the possibility of rehabilitation. Thus, defendant has, in fact, conceded that the legislature considered rehabilitative potential in fashioning the minimum sentences for these crimes. It is only when added *together* (because of consecutive sentencing) that these two "non-life sentences" total a number that defendant finds constitutionally violative. However, mandatory consecutive sentencing affects only the *manner* by which the sentence is carried out, and not the punishment itself. See *People v. Anderson*, 325 Ill. App. 3d 624, 638 (2001) ( "consecutive sentencing does not increase any of defendant's individual sentences for an offense beyond the statutory maximum, but determines the manner in which those sentences will be served"); see also *People v. Phelps*, 211 Ill. 2d 1, 14 (2004) (consecutive sentencing determines only the manner in which a defendant will serve his sentences for multiple offenses); *People v. Avery*, 321 Ill. App. 3d 414, 419 (2001) (the imposition of consecutive sentences does not constitute an increase in penalty). Defendant cites no authority that consecutive sentencing is unconstitutional. Moreover, we note that our supreme court has found constitutional the mandatory firearm enhancements, noting that, in enacting them, the legislature considered rehabilitation. See *People v. Sharpe*, 216 Ill. 2d 491, 526 (2005). Further, while we are not holding

---

mandated natural life imprisonment, those same factors for juvenile defendants warranted instead a mandatory minimum sentence of 40 years: "The legislature evidently believed that this 40-year floor for juvenile offenders who commit egregious crimes complies with the requirements of *Miller*." *Buffer*, 2019 IL 122327, ¶ 39. Thus, the supreme court's decision that a sentence greater than 40 years for a juvenile constitutes *de facto* life was drawn from its analysis of legislative responses to *Miller*, and it was limited to juvenile sentences.

that no constitutional claim can succeed where it is based on a confluence of statutes, here, defendant has not met his burden of establishing the statutes, on their face, violate the rehabilitation clause.

¶ 55     In sum, we cannot subscribe to a position that there is *no set of circumstances* where it is constitutional for an adult defendant who commits first-degree murder *and* armed robbery with a firearm to be sentenced to 71 years in prison.  We presume that the legislature inherently considered rehabilitation when fashioning the sentencing range, and, therefore, a defendant who receives that minimum sentence has inherently had rehabilitative potential considered via receipt of the minimum sentence for each crime.  We recognize the harsh reality that virtually every offender subject to this scheme will spend the remainder of his or her life in prison.  However, we are not persuaded that this necessarily reflects a derogation of the legislature's constitutional duty to consider rehabilitative goals.  Defendant's facial constitutional claim fails.

¶ 56                    2. As-Applied Constitutionality

¶ 57     Next, defendant argues that the provisions are unconstitutional *as applied* to him, an 18-year-old with rehabilitative potential and a limited criminal history.  Defendant notes that the trial court found that he is "a very young man," had rehabilitative potential, and that 35 years for murder and 20 years for armed robbery struck the appropriate balance between the seriousness of the offenses and defendant's "family life, his age, and his ability to possibly rehabilitate himself while in prison."  The court noted that, if defendant had been older and lacked any rehabilitative potential, it would have imposed the maximum sentence.  Nevertheless, despite its recognition of rehabilitative potential, defendant argues, "the court had *no choice* but to impose a *de facto* life sentence."  (Emphasis added.)

¶ 58    Defendant further asserts that the court's finding concerning his rehabilitative potential is supported by the record, as he: (1) had no adult criminal record; (2) had only a single juvenile delinquency adjudication; (3) expressed sorrow for his actions, apologized to Williams's family members, and asked for their forgiveness; and (4) admitted to a drug problem.    Defendant references *Miller*, 567 U.S. at 471, and similar caselaw to point out that he was only 18 years old when he committed these crimes, that the law recognizes that there are significant psychological differences between juveniles and adults that matter at sentencing, and that, given their greater capacity for change, irrevocably sentencing juveniles to prison for life is contrary to the goal of rehabilitating them.    Defendant acknowledges that those cases have been restricted to minors under age 18, but he cites research that he asserts reflects that neurological development continues into the mid-20s and well beyond the age of legal adulthood.    He clarifies that he is not specifically contending that *Miller* applies to his particular circumstances, but merely that his age is one of several factors demonstrating that a mandatory *de facto* life sentence fails to adequately reflect the constitutional goal of restoring him to useful citizenship.    Finally, defendant asserts that his sentence violates the eighth amendment because the rationale underlying *Miller*, *i.e.*, the underlying qualities that distinguish juveniles from adults, do not simply disappear when an individual turns 18.    However, he acknowledges that our supreme court has found that the *Miller* requirements do not apply to 18-year-old defendants.    See, *e.g.*, *Harris*, 2018 IL 121932, ¶ 61.

¶ 59    Finally, defendant asserts that the trial court here recognized the developing research when it urged the legislature to reconsider mandatory sentencing statutes that result in *de facto* life sentences.    In addition, he notes that the invalidity of the sentencing scheme as applied to him is underscored by the trial court's obvious dissatisfaction with it, its comments that it did "not like" the sentence it had to impose, and its belief that 35 years for murder and 20 years for armed robbery

were appropriate. As such, defendant contends that the confluence of statutes mandating his sentence violate the rehabilitation clause as applied to him.

¶ 60    A party raising an as-applied constitutional challenge must establish that the statute is unconstitutional as it applies to the specific facts and circumstances of his or her case. *Id.*, ¶ 38. Assuming that defendant's claim is truly an as-applied one (see, *e.g.*, *id.* ¶¶ 68-73 (Burke, J., specially concurring)), we are not convinced that it does not suffer from the same infirmities found in *Harris*. It is true that, unlike the defendant in *Harris*, defendant challenged the constitutionality of his sentence below. Accordingly, he argues that, unlike *Harris*, the record here is sufficiently developed because he raised his constitutional challenge before the trial court, "a hearing was held on it, and the trial court entered relevant findings." He notes that the State has not identified any gaps in the record that would preclude our review. Defendant contends that three findings already in the record are alone adequate to establish that the mandatory minimum sentence here violated the rehabilitation clause as applied to him: (1) defendant had rehabilitative potential, as demonstrated by the record and "common sense"; (2) "below minimum" sentences, *i.e.*, 35 years for murder and 20 for armed robbery, would have struck the appropriate balance between punishment and rehabilitation; and (3) those sentences could not be imposed as a consequence of mandated consecutive sentencing and 50 years in firearm enhancements.

¶ 61    However, the only hearing held here concerned defendant's motion to reduce the sentence and the court's findings that, in imposing the 105-year sentence, it considered rehabilitative potential, the pre-sentence report, and defendant's age. The supreme court expressly rejected the argument that basic information about a defendant that is contained in a presentence investigation report was, in *Harris*, sufficient to develop the record with respect to how research developments actually applied to the defendant's circumstances. *Id.*, ¶ 46. Similarly, the hearing here was not

an evidentiary one to ascertain how the evolving science on juvenile maturity and brain development applied to defendant's specific facts and circumstances, such that a sentence *below* the minimum is warranted. Indeed, defendant repeatedly claims that, unlike the defendant in *Harris*, he is not asserting that *Miller* applies to him and that he only refers to that line of cases to explain that his age is one of several factors demonstrating that a mandatory *de facto* life sentence fails to adequately reflect the constitutional goal of restoring him to useful citizenship. However, if this is an as-applied challenge, that line of cases ultimately remains his "hook" to argue for a sentence lower than the minimum that other, older defendants who commit the same crimes must receive. Indeed, defendant here does not ask that we remand for the court to impose the mandatory minimum sentence; he asks instead that we give the court discretion to impose *less* than the minimum, given his unique circumstances. Specifically, defendant requests that we find the statute unconstitutional as applied to him and remand for resentencing, instructing the trial court to consider as discretionary the firearm enhancements. That remedy, he explains, would reduce the minimum aggregate sentence to 26 years (20 for murder and 6 for armed robbery), while still permitting the trial court to impose the enhancements if it found doing so appropriate under the circumstances. See *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 80 (15-year-old defendant's sentence violated the proportionate penalties clause, and the trial court would disregard the statutorily-mandated firearm enhancements at the new sentencing hearing). Thus, there is tension between the as-applied and facial challenges in that defendant's "as-applied" challenge here rests on the fact that, despite its recognition of his personal circumstances and rehabilitative factors, the court had no discretion to impose less than the mandatory minimum *de facto* life sentence, which is a condition created by the legislature. As Justice Burke explained:

"Under the present statutory scheme, the trial court does *not* have the discretion to consider any of the unique circumstances of [the] defendant's case. Only if the trial court was granted the discretion to impose a lesser sentence and the cause was then remanded for resentencing would [the] defendant's personal history become relevant. And the only way that the trial court could possess such discretion would be if this court were to first agree with [the] defendant's claim that the legislature violated the constitution when it enacted a legislative scheme that results in a mandatory *de facto* life sentence for all offenders under the age of 21. Again, this is a facial challenge to the constitutionality of the legislature's actions." (Emphasis added.) *Harris*, 2018 IL 121932 at ¶ 74.

¶ 62    Accordingly, although defendant claims that he is not asking us to apply *Miller* and its progeny to him, it remains that he asks for less than the minimum sentence based upon his rehabilitative potential, which includes his youth. In that vein, although he discusses studies on brain development in juveniles and young adults, and the trial court seemed aware of the research trends, it does not appear that these studies were, in fact, presented and examined at the trial court level for how they applied to this defendant. We note that the State did not respond substantively to defendant's arguments that, as applied to him, his sentence violates the rehabilitation clause. However, relying on *Harris*, it asserts that defendant's claim is premature and that the record is inadequately developed to address his as-applied claim. We agree. As such, we find defendant's as-applied claim premature.

¶ 63    Finally, we note that defendant's argument that his sentence as applied violates the eighth amendment must fail for the reasons he acknowledges in his briefs.

¶ 64                        C.  Sentence – No Abuse of Discretion

¶ 65 Finally, defendant argues that, if we do not accept his constitutional arguments, any sentence here above the statutory minimum reflects an abuse of discretion. He argues that the court misunderstood and abused its discretion where it imposed 29 additional years to the minimum sentence. Defendant asserts that the court believed that its role was to first choose appropriate base sentences for the underlying crimes without regard for either mandatory consecutive sentencing or the effect of the firearm sentences. In contrast, defendant argues, the court should have considered an appropriate sentence within the entire framework of this case, such that it was to apply an enhanced overall range (*e.g.*, 45 years to life, consecutive to 31 years to life). In addition, defendant argues the court abused its discretion because: (1) despite recognizing his capacity for rehabilitation, it sentenced him to a term that foreclosed even a remote chance of release; (2) it failed to recognize that his relative youth made his "thought process" more susceptible to change; and (3) it aggravated his sentence to deter others, despite recognizing that general deterrence is not effective. As the court either misunderstood its discretion or abused it, and as the minimum sentence is itself a *de facto* life sentence, defendant asks that we exercise our authority to reduce his sentence to the statutory minimum.

¶ 66 A sentence within statutory limits will not be deemed an abuse of discretion unless it is at variance with the spirit and purposes of the law or manifestly disproportionate to the nature of the offense. *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). A reviewing court may not substitute its judgment for the trial court, because it may have balanced the factors differently. *People v. Horta*, 2016 IL App (2d) 140714, ¶ 40.

¶ 67 The trial court here did not abuse its discretion. Although defendant argues that the court viewed the range incorrectly, first finding a sentence in the base range and *then* adding the mandatory enhancements to it, we disagree that this is clearly error, given the statutory language,

reflecting that 25 years shall be added to the base term decided. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2014) (if, when committing first-degree murder, the defendant personally discharged a firearm that proximately caused death, 25 years or up to a term of natural life "shall be *added to the term of imprisonment imposed* by the court" (emphasis added); 720 ILCS 5/18-2(b) (West 2014) (an armed robbery in which the defendant personally discharges a firearm that proximately causes death is a Class X felony for which 25 years or up to a term of natural life "shall be *added to the term of imprisonment imposed* by the court") (emphasis added).

¶ 68    Defendant cites cases such as *People v. Clemons*, 2012 IL 107821, ¶ 3 and *People v. Hill*, 199 Ill. 2d 400, 446-47 (2002), to argue that the supreme court has indicated that the firearm enhancements are merely upward adjustments to the sentencing ranges, not additional penalties unto themselves. We recognize this caselaw and understand this position; nevertheless, having considered the record as a whole, we simply conclude that it is a distinction without difference here, where the trial court was clearly aware of the consecutive sentencing and mandatory enhancements when it fashioned the sentence, where the term imposed falls within the statutory range, and where there is nothing suggesting that the court *wanted* to impose a minimum sentence, but could not. In other words, defendant correctly asserts that the minimum possible sentence for first-degree murder with the firearm was 45 years and, for armed robbery, 31 years. Both, he contends, exceeded the court's findings that 35 years was appropriate for murder and 20 years for the armed robbery. However, the court made those findings as being appropriate for "murder" and for "armed robbery," but not for "murder with a firearm" and "armed robbery with a firearm." It gave no indication that it wished to apply 45 years for "murder with a firearm" or 31 years for "armed robbery with a firearm." To the contrary, it elaborated at the hearing on the motion to reduce the sentence that it would *not* be inclined to sentence defendant to the minimum here. It

expressed, "I could never give him the minimum on this case, *nor would I give him the minimum based upon his actions of executing a human being*." (Emphasis added.) Although the court commented that it did not "like" the sentence it had to impose and called on the legislature to consider the use of mandatory enhancements in young-adult sentences, that certainly does not reflect that it wished to impose the minimum, but could not, or render the sentence imposed that was within the range an abuse of discretion. The court twice recognized defendant's young age by imposing the *minimum* add-on of 25 years. Thus, although defendant suggests that the court's approach frustrated its ability to fashion an appropriate sentence, it is not clear, on this record, *how*: where the court and parties discussed the base sentences, enhancements, and ranges multiple times, and the court explained that it would not find a minimum sentence appropriate, we fail to see how the court's analysis was frustrated and resulted in an abuse of discretion.

¶ 69    In sum, we cannot find an abuse of discretion here, where the court sentenced defendant within the applicable statutory range, was aware of all applicable enhancements, consecutive sentencing, and other similar parameters, and where it accounted for defendant's youth in imposing the minimum add-ons.

¶ 70                                  III. CONCLUSION

¶ 71    For the reasons stated, the judgment of the circuit court of Kane County is affirmed.

¶ 72    Affirmed.