2025 IL App (2d) 240284
No. 2-24-0284
Opinion filed February 3, 2025

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 14-CF-76 |
| DEMITRI GREEN-HOSEY, | ) ) ) | Honorable Elizabeth K. Flood, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Mullen concurred in the judgment and opinion.

**OPINION**

¶ 1    After a third-stage hearing pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), the trial court granted defendant, Demitri Green-Hosey, a new sentencing hearing. The State appeals. For the following reasons, we affirm.

¶ 2                            I. BACKGROUND

¶ 3                    A. Trial, Sentencing, and Direct Appeal

¶ 4    After a jury trial, on August 31, 2016, defendant was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and armed robbery (*id.* § 18-2(a)(4)). The convictions arose from charges that, on January 13, 2014, defendant (age 18) and his older brother, Jaquan (age 20), telephoned Ari Williams (age 20) and arranged to purchase one ounce of marijuana for $300. The

three met at a Mexican restaurant in Aurora and proceeded to a back hallway near a bathroom. Defendant shot and killed Williams. The forensic pathologist testified that Williams died from a gunshot wound to the back of the head inflicted at close-range, *i.e.*, within 24 inches or less. After running out of the restaurant, the brothers proceeded to the Fox River and defendant disposed of the weapon. They then returned to an apartment on Lake Street, where defendant washed himself with bleach, shaved his head, and broke the phone they had used to arrange the meeting with Williams. Their sister, Jasmine, found them in her apartment, and they paid her to drive them to Joliet. In the car, defendant called his mother and said, "I love you mommy, I love you. I f*** up mommy. I love you." The brothers proceeded to a motel in Cicero, where they spent the night. They were arrested the next day, while trying to board a train. Jaquan was found in possession of the marijuana and $373 cash. The primary disputed issue at trial was whether defendant acted in self-defense. At the time of his arrest, Jaquan told police that the gun was defendant's and that they had planned only to take the marijuana and run. The parties stipulated that, on August 23, 2016, Jaquan told two assistant state's attorneys that there was *not* a plan to rob Williams. Rather, he told them that, when he began to pay for the marijuana, defendant pulled out a handgun, stated "[w]e ain't paying for anything," and shot Williams in the back of the head.

¶ 5    A presentence investigation report was provided to the court, and a sentencing hearing was held on November 4, 2016. The trial court considered the statutory mitigating factors and found that none applied, although it commended defendant for apologizing and expressing sorrow. The court also recognized that there existed "very minimal" history of prior delinquency, no adult record, and no pending charges.

¶ 6    With respect to aggravating factors, the court found applicable the necessity to deter future crime. Further, the court stated that it was concerned that defendant had decided to take marijuana

without paying and to take a weapon with him to protect himself and had, in the court's estimation, at least three hours to realize that what he wanted to do was wrong; but at no point when walking into the restaurant to steal one ounce of marijuana "did he ever determine that he was going to change. And it's that thought process that really concerns this Court." The court commented that, while situations may arise where bad things happen in seconds, "that's not this case." The court found that it took a "unique mind" to decide to effectuate the robbery as it happened and that it was the robbery and the thought process that bothered the court more than anything else because "that process says I have no respect for anyone but my own personal feelings. And when you lose respect for everyone else's feelings but yourself, you no longer deserve the right to walk in free society because that is a thought process that might never change."

¶ 7 The murder conviction carried a minimum sentence of 20 years, while the armed robbery conviction carried a minimum of 6 years. As the crimes were committed with a firearm, both carried a mandatory minimum add-on of 25 years as well as mandatory consecutive sentencing. In total, the convictions carried a *mandatory* minimum sentence of 76 years' imprisonment. The court ultimately found that, due to defendant's age and lack of criminal history, the minimum add-on of 25 years for using the gun was appropriate. Thus, on the murder charge, the court sentenced defendant to 35 years' imprisonment, plus 25 years for the add-on, for a total of 60 years to be served at 100%. For the armed robbery, the court sentenced defendant to 20 years' imprisonment, plus 25 years for the add-on, for a total of 45 years to be served at 85%. It ordered that the sentences be served consecutively. Therefore, it sentenced defendant to 105 years' imprisonment.

¶ 8 Defendant moved to reconsider the sentence, with counsel arguing, in part, that the court did not consider certain mitigating circumstances (such as the fact that defendant had been homeless since age 14 and had received disability payments since age 6 for Attention Deficit

Hyperactivity Disorder (ADHD) and other mental health issues). He further argued that the 105-year sentence violated the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Defendant argued that, while one goal of sentencing was punishment, another was rehabilitation, *i.e.*, restoring defendants to useful citizenship. He argued that his sentence reflected *only* punishment, as 105 years' imprisonment constitutes a life sentence for an 18 year old with no criminal background.

¶ 9    On January 11, 2017, the court denied the motion. It disagreed that it did not consider defendant's rehabilitative potential and the entire presentence investigation report. The court noted that the mandatory add-ons meant that defendant would be sentenced to at least 50 years and that the total minimum sentence available in this case would have been 76 years. The court noted that, although it agreed that the aggregate 105-year sentence constituted a *de facto* life sentence, it gave what it felt was an appropriate sentence for each crime, adding that defendant was not a juvenile when he committed the crimes.

¶ 10    Further,

> "I looked at [defendant's] family life. I looked at his personal life, and it's not been a great personal life or family life; however, I did not have any evidence before me and I am using my common sense on this, I believe that at a young age everybody knows that it is absolutely improper, immoral, and a crime to take a gun, pull the trigger from about one foot, put a bullet in the back of somebody's head and kill them."

The court detailed the conscious and calculated decisions that defendant necessarily made when planning and committing these crimes, and it noted that defendant showed that he knew what he did was wrong when, "instead of sticking around and explaining himself as you would almost

always [do] in a self[-]defense issue," he ran, tried to disguise himself, and tried to get away with "what I consider an absolute execution of a human being."

¶ 11    The court further stated:

"[If defendant had been] age 50 or 60, he most likely would have gotten the maximum sentence in this case, because there would be no rehabilitating potential in this case. In fact, [defendant] is a very young man, and I looked at his rehabilitative potential, and I sentenced him under the law [as to] what I thought was appropriate. I did not give him the maximum. Quite frankly, I could never give him the minimum on this case, nor would I give him the minimum based upon his actions of executing a human being. That is the most heinous offense that anyone could possibly commit. *** I believe that this court did take into account the rehabilitative potential of [defendant], and this Court was required also to add on the 25-year sentence, which if I read the law correctly, I believe it could have been 25 to life in some instances. I gave him the minimum. I did not extend that out.

I do agree *had he been under 18*, *I would be allowed to consider those 25[-]year add-ons and not give them* in this case. He is not. I will follow the law, and I believe the sentence I gave him of 20 years on the armed robbery and 35 years on the murder are appropriate in this case. They protect society. They rightfully do punish [defendant] for his actions of executing a human being, but they also do take into account his family life, his age, and his ability to possibly rehabilitate himself while in prison." (Emphases added.)

¶ 12    Nevertheless, the court noted that it joined other courts in encouraging the legislature to reconsider sentencing schemes for young adults, particularly the mandatory add-ons and, in some circumstances, consecutive sentencing. The courts urged the legislature to consider the research regarding brain development in young adults who are not legally juveniles. Moreover:

"I am not saying that this is the case, but I believe it is time for the legislature to take a look at the sentencing and allow the courts to attempt to formulate a sentence on a case-by-case basis and not handcuff the courts by requiring mandatory sentences that basically do give a *de-facto* life sentence.

I do not like the sentence that I have to give [defendant]; but, quite frankly, I am not the one that caused these issues. [Defendant] is. [Defendant] is the one who executed the gentleman. I am compelled by the law to sentence [defendant]. I did so [in] what I believe to be consistent with the law by taking into [account] not only the punishment factor but his rehabilitative potential in this case; and, therefore, the 105-year total sentence will remain, 20 years for the armed robbery, 35 years on the murder case with a 25-year add-on to each case for a total of 105 years."

¶ 13 On appeal, defendant argued that his sentence violated the Illinois Constitution's proportionate penalties clause, both on its face and as applied to him. Ill. Const. 1970, art. I, § 11. This court affirmed. *People v. Green-Hosey*, 2019 IL App (2d) 170110-U. After rejecting the facial challenge, we determined that we could not address his as-applied challenge because the record was not developed regarding how the science and research concerning juvenile brain development, as reflected in *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny, applied to defendant personally. *Green-Hosey*, 2019 IL App (2d) 170110-U, ¶ 62.

¶ 14 B. Postconviction Proceedings

¶ 15 1. First and Second Stages

¶ 16 In March 2021, defendant filed a *pro se* postconviction petition. The case was originally assigned to the sentencing judge. The court advanced the petition to the second stage and appointed counsel. Afterward, the case was assigned to a different judge.

¶ 17    Defense counsel filed an amended petition on defendant's behalf. The amended petition alleged that, as applied to defendant, the sentencing statutes and defendant's 105-year sentence violated the proportionate penalties clause of the Illinois Constitution. In support, the amended petition attached an April 15, 2021, report authored by James Garbarino, Ph.D., a developmental psychologist, regarding defendant. In sum, the report concluded that, due to specific factors in defendant's life, his brain was likely less developed than brains of those in the general population who had not experienced similar adverse factors. The State moved to dismiss the amended petition.

¶ 18    On March 24, 2023, the court denied the State's motion to dismiss. It found that, accepting all well-pleaded facts as true, Dr. Garbarino's report—which specifically considered the factors outlined in *Miller* as they related to defendant—was sufficient to establish that defendant's individual characteristics warranted the application of *Miller*. Further, the court considered whether defendant's sentencing hearing was *Miller* compliant. It noted that, when defendant was sentenced, some of the information considered by Dr. Garbarino was not contained in the presentence investigation report and Illinois courts had not yet extended *Miller* protections to young adults. The court summarized that, per *Miller*, a sentencing court must consider that juveniles are impaired by certain characteristics—such as immaturity, impetuosity, and a lower capacity to consider future consequence—that impact their decision-making abilities. Further, a sentencing court must consider the potential for rehabilitation. However, here, the court noted, the State's own recitation of facts and testimony from the trial "contains no evidence of premeditation (the defendant testified he shot the victim in self-defense after a struggle, and his brother testified that he didn't even know the defendant had brought a gun)." In addition, the court noted that, although the State quoted portions of the sentencing court's ruling regarding defendant's decisions,

"it appears that at sentencing the court failed to consider the possibility of *impetuous* conduct by the defendant in committing this crime, or his *capacity* to consider the future consequences of his actions. The sentencing court also noted in its ruling on the defendant's motion to reconsider sentence that the court was 'handcuffed' by the mandatory sentence that basically required a *de facto* life sentence \*\*\*, therefore undercutting the argument that the court was able to fully consider the rehabilitative potential of the defendant in imposing the 105-year sentence." (Emphases added.)

¶ 19 The court denied the State's motion to dismiss and found that defendant made a substantial showing that his individual characteristics required the application of *Miller* and that his sentencing hearing was not *Miller* compliant.

¶ 20                                    2. Third-Stage Hearing

¶ 21 On October 13, 2023, the court held a third-stage evidentiary hearing on defendant's petition. In opening remarks, the State reminded the court that, at the third stage, defendant bore the burden and all favorable presumptions that existed at the first and second stages no longer applied.

¶ 22 Defendant called Dr. Garbarino to the stand. At the time of the hearing, Dr. Garbarino was an emeritus professor of psychology at Loyola University in Chicago, as well as at Cornell University in Ithaca, New York. In 2020, Dr. Garbarino stopped teaching and continued his academic life as a professor with emeritus status. Dr. Garbarino obtained his bachelor's degree from Saint Lawrence University in 1968, his master's degree in education from Cornell in 1970, and a Ph.D. in human development with a specialization in developmental psychology, also from Cornell, in 1973. He is a member and elected fellow of the American Psychological Association in the divisions for developmental psychology, child and adolescent clinical psychology, and the

global alliance for mental health. Dr. Garbarino has received numerous awards, including being named one of 33 influential psychologists in America by the American Psychological Association, which focused particularly on his work on the developmental impact of trauma. He is the author of more than 100 professional articles and book chapters and 26 books, most of which deal with issues in developmental psychology, and he has lectured throughout the country and around the world. Dr. Garbarino has testified around 300 times in the past 30 years as an expert in developmental psychology, including in Illinois. On those occasions, Dr. Garbarino's testimony has overwhelmingly been for the defense; he has testified as an expert for the prosecution twice. With no objection, Dr. Garbarino was accepted as an expert in developmental psychology, and his curriculum *vitae* was admitted into the record.

¶ 23    Dr. Garbarino is familiar with *Miller* and the juvenile sentencing laws as they have evolved in recent years and as they apply to both juveniles and young adults; in fact, he authored a book entitled "Miller's Children." As he has been asked to work around the country on resentencing cases, a standard format has emerged for his reports, such that they cover the developmental science issues embedded in *Miller* (as well as subsequent cases), *Miller*'s extension to young adults, and any evolutions in the field, and they then move to an individual assessment specific to the defendant being evaluated. He explained that it is important to include the legal and scientific framework in the report to understand whether it applies to a particular defendant or whether the defendant's answers to questionnaires Dr. Garbarino provides are, in light of the research, significant.

¶ 24    With respect to developmental science, Dr. Garbarino's report, in sum, explained that brain development in the frontal lobe, which controls impulses, planning, and management of emotions, is compromised in an individual under the age of 25. Indeed, fully "adult" and consistently present

executive functioning and affective regulation are generally not reached until brain maturation at age 26. Accordingly, the research suggests that the term "emerging adulthood" is more accurate than "early adulthood" because it more precisely recognizes that individuals in the 18 to 25 age range are not adults (from the perspective of development) but rather manifest a mixture of adolescent and adult characteristics and functioning. However, development of the brain's "white matter" can be impacted by social conditions and experience. "This speaks to the double whammy experienced by youths who are involved in violent crime: they suffer from both the general limitations of unformed brains *and* the disadvantaged functioning that arises from their adverse childhood experiences."

¶ 25    Dr. Garbarino believed that, through word of mouth, defendant had heard his name at Stateville Correctional Center. Defendant wrote to him, and Dr. Garbarino responded by mail. He sent defendant a questionnaire called the Adverse Childhood Experiences (ACE) Scale and a list of life-history questions. Dr. Garbarino instructed defendant to answer all questions and be as honest as possible. He elaborated that the ACE scale is a series of 10 questions, some with multiple parts, asking about experiences from growing up. The scale asks for simple yes or no answers, and Dr. Garbarino requests that, for any "yes" answer, the defendant provide an explanation or examples and details. According to Dr. Garbarino, the ACE scale has become "very widely" used across the country, due to its simplicity. Further, "more importantly, it turns out this relatively simple 10 questions is incredibly predictive of life difficulties," such as violent behavior, substance abuse, suicidal behavior, and depression. The higher the score, the greater the adversity experienced. Dr. Garbarino explained that around 65% of people score a 0 or 1, whereas only one-tenth of 1% (*i.e.*, 0.1%) score an 8, 9, or 10. The scale is powerful in predicting late-in-life difficulties based on the individual level of adversity a person has experienced. Dr. Garbarino

incorporated defendant's initial answers into a first draft of a report, and then he returned it to defendant with a request for more information in certain areas. Defendant complied with the request, and, ultimately, the complete report was dated April 15, 2021. As to why the exchange of information was only in writing, Dr. Garbarino explained that "[s]o much of this was occurring after COVID hit Illinois and certainly shut down any face-to-face visits."

¶ 26    Defendant answered "yes" to all 10 ACE questions. Again, only about 0.1% of people report having experienced that degree of adversity. Dr. Garbarino's report, which was admitted into evidence, thoroughly detailed defendant's answers, but, at the hearing, he summarized briefly that defendant's reported experiences included (1) verbal degradation by his mother; (2) discipline through beatings; (3) molestation by a female foster parent; (4) emotional neglect (for example, he recalled his mother hugging him only once, which was after his incarceration); (5) physical neglect, including lack of food and heat in the house; (6) his parents' separation; (7) his father's physical abuse of his mother; (8) his father's drug addiction; (9) his mother's depression; and (10) the incarceration of a household member (specifically, his father). Dr. Garbarino testified that his conclusion about defendant was that, within a reasonable degree of psychological certainty, "his specific experience of adversity and trauma in the social environment in which he was growing up placed him at extremely high risk for delinquent violent behavior." He elaborated that, given defendant's accumulation of adversity and traumatic experiences—coupled with the fact that, at age 18, defendant was in a category of individuals that, developmental research reflects, has difficulty with making good decisions, executive functioning, managing emotions, and overall affective regulation, his conclusion was that "the current status of science would say that, given [defendant's] experience, he should be sentenced with respect to the juvenile protections. His report further stated, in part, that defendant's behavior at the time of the shooting reflected

"impulsiveness and limited consideration of consequences due to his immature brain development. His behavior was the result, in part, of the disrupted family relationships that impaired his development," as well as his social environment. Finally, based in part upon his review of defendant's disciplinary records and academic progress from the Illinois Department of Corrections (DOC), Dr. Garbarino opined that defendant had begun making progress towards rehabilitation and positive transformation and did not appear to be one of the "rarest" of young offenders incapable of significant improvement.

¶ 27    On cross-examination, Dr. Garbarino agreed that it was his opinion that there exists a clear scientific basis to extend *Miller* protections beyond juveniles. In response to the State's question, Dr. Garbarino explained that it was *not* his opinion that no individual age 18 to 25 should be considered for a life or *de facto* life sentence unless there is a realistic possibility for release. Rather, he acknowledged that there are individuals who are so damaged that it is unreasonable to expect that they could engage in rehabilitation, which he believed comports with the Supreme Court precedent stating that only the very rarest cases will involve individuals who are irreparably harmed and incapable of rehabilitation. He estimated that, in the 300 or more cases that he had worked on, perhaps on three to five occasions he had opined that someone over age 18 should not be released from prison or have the opportunity for release. Again, Dr. Garbarino believed that low number comported with the Court referencing the rarest of cases.

¶ 28    Dr. Garbarino further opined that defendant would not reach brain maturation until about the age of 25 or 26. His opinion was based on the science that reflects that brain maturation cannot be presumed until around age 25, coupled with developmental and neuroscience that reflects that adverse experiences tend to slow down the process of maturation, due to their effects on white matter in the brain. Dr. Garbarino opined that a 20-year murder sentence for an offender 18 to 25

years old is "generally good enough" because it takes 10 years for the brain to mature and then another 10 years to use that mature brain in the process of rehabilitation transformation. The State asked Dr. Garbarino whether, in assessing an offender's rehabilitative potential, he considered the facts or seriousness of the offense, and he responded, "only in the most limited way," explaining, "Once again, I'm unaware of research that shows that the severity of the crime has much predictive power for predicting rehabilitation and transformation. So my focus is on—not so much on what did they do but why."

¶ 29    Further, when the State asked Dr. Garbarino specifics about Illinois law regarding sentences for offenders 18 and older, including with respect to firearm enhancements, he explained that his emphasis is on what he thinks makes sense from a *developmental* point of view, recognizing that there are legal, moral, and political issues that may affect sentencing rules and regulations. Dr. Garbarino was not aware of the minimum sentence defendant would face upon resentencing, although, to him, both a 76-year and a 105-year sentence are the same, in that they are clearly *de facto* life sentences.

¶ 30    The State introduced 27 of Dr. Garbarino's reports from other cases, which followed his standard format with perhaps minor variations in structure. Dr. Garbarino acknowledged that defendant's family paid him $3,000 to prepare an evaluation, while defense counsel paid him for his services in testifying and travel expenses. In addition to the ACE questionnaire and life-history questions, Dr. Garbarino reviewed online newspaper articles about defendant's case and he read defendant's direct appeal and information from the DOC, including defendant's disciplinary record, mental health medication paperwork, academic assessment (which placed him academically between the third and fourth grades), and certificate of achievement for completing an anger management program. Dr. Garbarino was not with defendant when he prepared his

answers; he was, however, able to compare the handwriting in the first and second round of responses from defendant and the handwriting was the same. Dr. Garbarino did not request defendant's medical records from the prison, his psychiatric medical records from throughout his lifetime, his school records, or Department of Children and Family Services (DCFS) reports, nor did he interview third parties or request neuropsychological testing. He explained that such actions were outside the scope of his role and that he just analyzes the information given. Dr. Garbarino agreed that his report assumed the truth of what defendant told him. Specifically,

"[M]y role is as an analyst, it's not an investigator. So I'm just as an education witness trying to make sense of the information that I have without engaging in a full-scale investigation.

For me, it was sufficient to know that he had had some treatment for depression and some presumed diagnosis of depression, particularly given that's one of the things that's being predicted by the [ACE scale]. So it was confirmatory."

¶ 31    Defendant rested. The State presented no witnesses.

¶ 32    On December 11, 2023, the court granted defendant's amended petition for postconviction relief. The court reiterated that, at the third stage, it acts as factfinder, resolves any evidentiary conflicts, and determines witness credibility and the weight to give evidence and testimony. The court first rejected the State's position that, to succeed on his claim that his 105-year sentence violates the proportionate penalties clause as applied to him, defendant was required to specifically prove that his sentence shocked the moral sense of the community. Referencing *People v. House*, 2019 IL App (1st) 110580-B, and *People v. Ruiz*, 2020 IL App (1st) 163145, the court noted that, even for murder and without regard to whether the sentence is mandatory or discretionary, the Illinois Constitution prohibits a life sentence for a young adult offender without consideration at

sentencing of youth and its attendant circumstances. The court determined that, if a defendant has established that his or her individual characteristics required application of *Miller* and that the initial sentencing hearing did not comply with *Miller*, there is no need to make a separate showing that the sentence shocks the moral sense of the community.

¶ 33 Next, the court found Dr. Garbarino credible. It summarized Dr. Garbarino's expertise, process, and conclusion that,

> "to a reasonable degree of psychologic certainty, defendant's experience of adversity and trauma left him at high risk of delinquent and violent behavior, and at age 18, his executive functioning was not fully developed and he had difficulty managing emotions, such that his characteristics as a juvenile should have been considered at sentencing."

Further, it noted that Dr. Garbarino explained that, generally, neuroscience teaches that the brain is not fully mature until age 25 or 26 and ACE factors can slow that development. Defendant's responses reflected that he experienced all 10 ACE factors, which occurs rarely. The court indicated it had reviewed the State's 27 exhibits of reports Dr. Garbarino had prepared in other cases. Although the reports contained much of the same background information and relevant science as the report in this case, the court found that they were not identical and that much of the similarity was due simply to repeated recitation of the science and studies that are the bases of Dr. Garbarino's examinations of and opinions on juvenile offenders. Therefore, the court did not find that the State's exhibits rendered incredible Dr. Garbarino's testimony. Further, the court noted that, when asked if he believed that no 18 to 25 year old should be considered for a life sentence, Dr. Garbarino responded that there are exceptions if there is a finding that the offender cannot be rehabilitated. Moreover, the court acknowledged the State's argument that much of the information upon which Dr. Garbarino relied was self-reported by defendant and was not independently

verified. However, it found that, "not only was much of the information reported by the defendant consistent with the pre-sentence report, which this court previously relied upon for sentencing, but the information in those reports [is] not generally independently verified either." The court found Dr. Garbarino's testimony to be credible and his opinions to be well-founded on facts and based on his expertise. Thus, the court found that defendant satisfied his burden of making a substantial showing that his individual characteristics required the application of *Miller* principles.

¶ 34 The court next found that defendant also made a substantial showing that his original sentencing hearing was not *Miller* compliant. Here, the court explained, it had already found at the second stage that the sentencing court did not consider the possibility of defendant's impetuous conduct or rehabilitative potential, two of the required *Miller* considerations. Having reviewed the sentencing transcript, it again found that defendant's sentencing hearing was not *Miller* compliant. Additionally, the court considered that the sentencing court had found that no statutory mitigating factors applied, although defendant was 18 years old and the presentence investigation report revealed that his risk to reoffend was only moderate. Further, the sentencing court had commented that, "[w]hen you lose respect for everyone else's feelings but yourself, you no longer deserve the right to walk in free society because that is a thought process that might never change"; however, the postconviction court found that "this is at least in part due to the fact that Illinois courts had not yet extended *Miller* protections to young adults." The court ordered a new sentencing hearing.

¶ 35 The State moved the court to reconsider, and defendant filed a response. On March 22, 2024, the court denied the motion. In addition to rejecting the State's arguments, the court clarified, stating that

"I am specifically pointing out this court has not made any finding as to the applicability of a parole statute or the minimum sentence should this move forward to

sentencing hearing. Those are factors that were outside of the court's consideration in applying the law to whether *** third[-]stage relief should be granted. As to any issues regarding the sentencing itself, those will be addressed at the sentencing hearing."

¶ 36    The State appeals.

¶ 37                                    II. ANALYSIS

¶ 38                              A. Standards of Review

¶ 39    The Act "provides a remedy to a criminal defendant whose federal or state constitutional rights were substantially violated in [his or her] original trial or sentencing hearing." *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002). The specific postconviction claim that defendant raised here is that his sentence violates the Illinois proportionate penalties clause as applied to him, which requires him to show " 'how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to [his] specific facts and circumstances.' " *Ruiz*, 2020 IL App (1st) 163145, ¶ 55, *abrogated on other grounds by People v. Hilliard*, 2023 IL 128186, ¶ 28 (quoting *People v. Harris*, 2018 IL 121932, ¶ 46). In other words, defendant was required to prove that, "from a developmental standpoint, [he] had the characteristics of a juvenile." *People v. Garcia*, 2024 IL App (2d) 210488-B, ¶ 17. In *Ruiz*, the court outlined the procedure that must be followed for a young adult, such as defendant, to raise a claim that the *Miller* line of cases applies to him or her: (1) the young adult defendant must plead, and ultimately prove, that his or her individual characteristics require the application of *Miller*; (2) if, and only if, the young adult makes such a showing, the trial court considers whether the initial sentencing hearing complied with *Miller*; and (3) if the initial sentencing hearing was *Miller* compliant, then the trial court can reject the defendant's claim, but, if it was not, the court should order resentencing. *Ruiz*, 2020 IL App (1st) 163145, ¶ 52.

¶ 40    Here, defendant's petition proceeded to the third stage of the proceedings (the Act establishes a three-stage process for the adjudication of a postconviction petition (*People v. English*, 2013 IL 112890, ¶ 23)), and, at this stage, defendant bears the burden of making a substantial showing of a constitutional violation that led to his or her conviction or sentence (*People v. Pendleton*, 223 Ill. 2d 458, 473 (2006)). Specifically, a defendant's burden at the postconviction hearing is to establish his or her claim by a preponderance of the evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92; *People v. Stovall*, 47 Ill. 2d 42, 47 (1970). A preponderance of the evidence is evidence that renders a fact more likely than not. *People v. Urdiales*, 225 Ill. 2d 354, 430 (2007).

¶ 41    Further, at the third stage, "the circuit court serves as the fact finder, and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *People v. Domagala*, 2013 IL 113688, ¶ 34. Critically here, "[a]fter an evidentiary hearing where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous." *English*, 2013 IL 112890, ¶ 23. Specifically, because the postconviction judge was able to observe and hear the witnesses at the evidentiary hearing, he or she occupies a "position of advantage in a search for the truth" that "is infinitely superior to that of a tribunal where the sole guide is the printed record." (Internal quotation marks omitted.) *People v. Coleman*, 183 Ill. 2d 366, 384 (1998). As such, " ' "unless something appears to show that the determination by the trial judge was manifestly erroneous, the [credibility determinations made by the] trial judge, who had an opportunity to see and hear each witness[,] will be upheld." ' " *Id.* (quoting *People v. Bracey*, 51 Ill. 2d 514, 517 (1972), quoting *People v. Alden*, 15 Ill. 2d 498, 503 (1959)). "Manifest error" is error that is "clearly plain, evident, and indisputable." *People v. Taylor*, 237 Ill. 2d 356, 373 (2010).

¶ 42                    B. Court's Reliance on Dr. Garbarino's Report

¶ 43    The State argues first that the court failed to hold defendant to his burden of proving a substantial constitutional violation under the proportionate penalties clause as applied to him. More specifically, the State asserts that the court "abdicated its responsibility to determine credibility as to the underlying facts regarding defendant's individual characteristics." According to the State, at the third stage, where defendant no longer enjoyed the presumption that the allegations in his petition were true, he had the burden to make a substantial showing, *i.e.*, one that is real and weighty, as opposed to illusory and trivial, supporting his claim of a constitutional violation. The State contends that here, however, the court "inexplicably and improperly" equated defendant's third-stage burden with what a court receives and considers from a defendant at a sentencing hearing, where a defendant has no burden.

¶ 44    Further, the State argues that the primary flaw in the opinion offered by defendant's sole witness, Dr. Garbarino, is that he failed to verify any of the information or conduct any psychological testing of defendant to ascertain whether he fell into the range of rare defendants who might be so damaged that they could not be rehabilitated. Rather, Dr. Garbarino merely accepted as true defendant's assertions about his history. The State contends that the court, therefore, erred by wholesale adopting those assertions as true at a third-stage hearing, "because at bottom, they are based on defendant's credibility, which was not under oath or subject to cross-examination." Indeed, the State notes, it was not sufficient for defendant to merely argue that his youth was not adequately considered, which is akin to an abuse-of discretion, not a constitutional, argument; rather, he had to prove that, from a developmental standpoint, he had the characteristics of a juvenile. The State asserts that, in other cases, courts have "criticized" Dr. Garbarino's testimony. Moreover, the State points out that it offered the court 27 reports Dr. Garbarino authored

for other offenders and that the reports are nearly identical to each other and to the one he authored for defendant. It argues that this demonstrates that his opinion is not unique to defendant's individual circumstances but is nothing more than an age-based conclusion, insufficient to support a proportionate-penalties claim. The State asks this court to reverse, as the only evidence that defendant, an adult offender, had the developmental characteristics of a juvenile was Dr. Garbarino's repetition of the unverified information that defendant provided to him. The State argues that an expert's opinion is only as valid as the factual basis and methodology supporting it, referencing the expression "garbage in, garbage out," and, for that reason, maintains that the court "erred in relying on facts that were assumed to be true at the third stage, as opposed to requiring defendant to meet his burden of proving those facts." We disagree.

¶ 45 We cannot conclude that the postconviction court's decision here was manifestly erroneous. The record belies the State's assertion that the court abdicated its role to determine credibility or hold defendant to his burden to make a substantial showing in support of his petition. Not only did the State remind the court at the beginning of the evidentiary hearing that, at the third stage, defendant bore the burden and no longer benefitted from presumptions in his favor, but the court also explicitly *recognized* its role as factfinder and its responsibility to assess credibility and it *exercised* that role in weighing the evidence. The State's disagreement with the court's credibility finding does not render it manifestly erroneous.

¶ 46 Further, the crux of the State's argument that the postconviction court improperly found that defendant satisfied his burden is that Dr. Garbarino's testimony and report were based on unsworn information that defendant self-reported. It repeats its criticism, raised below to the court and during cross-examination, that Dr. Garbarino failed to independently investigate the information that defendant self-reported. However, while this line of attack might have been found

appropriate in other cases (see, *e.g.*, *People v. Masters*, 2024 IL App (4th) 230370), we do not find that argument availing here, given our standard of review. Indeed, in *Masters*, the appellate court *affirmed* the postconviction court's rejection of the defendant's as-applied claim, and it explained that there were bases in the record to support the court's findings. For example, the defendant's presentence investigation report and the record both contradicted the information he provided to Dr. Garbarino and, further, the defendant had a demonstrated history reflecting dishonesty; as such, the appellate court could not find manifestly erroneous the court's denial of the defendant's claim. *Id.* ¶¶ 75-112; *id.* ¶ 122 (Knecht, J., specially concurring). Justice Knecht, specially concurring, noted, "[t]his decision is sound *given the standard of review* and Dr. Garbarino's failure to go beyond defendant's self reporting to verify *** assertions *** that were inconsistent with the presentence investigation report." (Emphasis added.) *Id.* ¶ 122.[1]

¶ 47    In contrast, here, the court considered the State's similar arguments regarding Dr. Garbarino's approach and reliance on defendant's representations, but it *rejected* those arguments after considering Dr. Garbarino's expertise, his admitted role as an analyst and not an investigator, and the contents of the report and information provided. *Critically*, it found that the information defendant provided to Dr. Garbarino was *not* inconsistent with information he had already provided in the presentence investigation report. Implicit in the State's "garbage in, garbage out" argument is the notion that the information defendant provided to Dr. Garbarino was, in fact, "garbage." It implies that defendant's information was inherently suspect and inaccurate, such that

---

[1]Justice Knecht concluded that, "[a]t some point, courts need to grapple with the scientific evidence of how emerging young adults think and process information. Emerging adults are not foreclosed from raising as-applied proportionate penalties challenges based on evolving science of maturity and brain development. As the majority notes, Dr. Garbarino's testimony was arguably overladen with opinion without specific, verifiable support *in defendant's case*. Yet, the viewpoint of age 18 as a magic bright line, and an unwillingness to fully consider evolving science, is a serious disadvantage to emerging young adults charged and convicted of crimes." (Emphasis added.) *Masters*, 2024 IL App (4th) 230370, ¶ 125 (Knecht, J., specially concurring).

*additional* documentation of that information was necessary to verify its truth, support Dr. Garbarino's findings, and satisfy defendant's burden of proof on his petition. But, unlike in *Masters*, there was no obvious basis here to suggest that the information was incorrect simply because defendant provided it.

¶ 48    For example, the State has pointed out that defendant reported information to Dr. Garbarino that was not also in the presentence investigation report, *i.e.*, that there was *additional* information provided. However, it is possible that defendant provided more thorough answers to Dr. Garbarino, depending on the questions asked, and, in any event, the fact that more information was provided does not render that information contradictory or inconsistent with the information previously provided. Indeed, this court has reviewed the presentence investigation report, and it reflects, in sum, that defendant was homeless starting around age 14, when he did not get along with his mother's boyfriend, so he left the home and was told he could not come back; his father was in prison most of his life, and defendant has multiple family members who have criminal histories; he has five brothers and five sisters from his parents and 15 half siblings on his father's side; he reported five relatives with drug problems; he explained that his family was involved with DCFS when he was very young, up until around age 8, and he was put in foster care; he reported physical abuse at the hands of his father from around age 5 until age 13 or 14; defendant attended an alternative high school, where he completed only the 10th grade and was in special education classes; he was diagnosed with ADHD when he was five years old and took medication for it until around age 14; he reported feeling stress and experienced insomnia; he first tried alcohol at age 15; he explained that he abused the prescription drug Ritalin, and, when the doctor took him off of it, he used marijuana to help him focus; and he reported "yes" to having had a drug problem. Again, as the postconviction court found, the foregoing information from the presentence investigation

report does not contradict, and is largely consistent with, what defendant reported to Dr. Garbarino, which distinguishes this case from *Masters*. The court considered the State's arguments but determined that, in this case, the information defendant provided was *corroborated* by the presentence investigation report. Given the record, the court's finding was not clearly, plainly, and evidently erroneous.

¶ 49    Relatedly, although the court here noted that the information in the presentence investigation report was *also* not independently verified, we disagree with the State that this comment equates to the court "inexplicably and improperly" confusing defendant's third-stage burden with what a court receives and considers from a defendant at a sentencing hearing, where a defendant has no burden. It is clear to this court that the postconviction court understood defendant's burden and held him to it. Rather, we read the court's comment as merely pointing out that defendant's reporting about events and experiences in his life has never been independently verified but, in any event, has not been markedly inconsistent.

¶ 50    We also disagree with the State's attempts to find fault with the court's credibility finding on the basis that Dr. Garbarino's testimony has been critiqued in *other* cases or that his reports follow a common format. The amended postconviction petition here raises an as-applied constitutional claim, and all such claims are fact specific. See, *e.g.*, *Hilliard*, 2023 IL 128186, ¶ 21 ("an as-applied challenge is dependent on the particular facts and circumstances of the challenging party"). The fact that, in other cases, courts in the process of assessing claims at varying stages for different defendants with their own individual circumstances, have found Dr. Garbarino's testimony insufficient to support those claims is irrelevant to the credibility assessment that the court made *here*, after an evidentiary hearing. See, *e.g.*, *People v. Parish*, 2023 IL App (1st) 200011-U (Dr. Garbarino's testimony was used at an initial sentencing hearing, where his

testimony included, in part, that the defendant scored a "three" on the ACE questionnaire, which did *not* put him in "that highest category [within which] many murderers find themselves"; further, even though the defendant was not a juvenile when he committed the crimes, the initial sentencing court still considered the *Miller* factors and the proportionate penalties clause *before* imposing the sentence; initial sentencing court did not discount Dr. Garbarino's expertise, but would have preferred physical evidence specific to the defendant, such as MRI or CT scans; appellate court rejected on direct appeal the defendant's proportionate penalties challenge to his mandatory life sentence, noting that the sentencing court had not discounted Dr. Garbarino's testimony but found a lack of particularized evidence that the defendant was functioning at a level younger than his actual age when he committed the crimes); *People v. Croom*, 2022 IL App (4th) 210410-U (after a second motion for leave to file a successive postconviction petition, the appellate court had vacated the defendant's 50-year sentence for first degree murder committed at age 16, because it did not reflect that the sentencing court had determined that the defendant showed permanent incorrigibility; on remand, following a new sentencing hearing where Dr. Garbarino testified, the sentencing court resentenced the defendant to 50 years, noting that the defendant had lied to Dr. Garbarino; the appellate court then affirmed the sentence on appeal, rejected the defendant's argument that the sentencing court had abused its discretion and ignored the bulk of Dr. Garbarino's testimony, where it had considered the defendant's statements to Dr. Garbarino that were corroborated in the presentence investigation report but did not accept Dr. Garbarino's conclusions that had relied on the defendant's statements, at least some of which the sentencing court found were untrue); *People v. Mauricio*, 2021 IL App (2d) 190619 (Dr. Garbarino's testimony was used at an initial sentencing hearing but did not appear to establish that, from a developmental standpoint, the defendant had the characteristics of a juvenile; on direct appeal, this

court affirmed the 55-year prison sentence for first degree murder and rejected an age-based proportionate penalties challenge, where the sentencing court had found exceptionally brutal and heinous behavior indicative of wanton cruelty).

¶ 51 Further, Dr. Garbarino expressed "age based" opinions, which he explained were grounded in young-adult developmental research and his expertise. However, as the postconviction court pointed out, Dr. Garbarino qualified those opinions, acknowledging that there are exceptions and that, while his perspective is one based in developmental psychology, other factors (political, moral, etc.) come into play when sentences are fashioned. Most importantly, he did not *only* make generalized statements about appropriate sentences for young adult offenders; rather, he reviewed defendant's individual circumstances and opined as to how the research applied to him. We also find no clear or obvious error with the court's rejection of the State's arguments that similarities in Dr. Garbarino's reports renders them incredible; indeed, the reports set out a background of the legal framework, the relevant developmental psychology research, and then an individualized assessment of how that information applies to the client before him and results in his conclusions.[2] We agree with the court that where Dr. Garbarino performed an individualized assessment, based on developmental research, of how defendant's experiences would have impacted his development such that, at age 18, he was more like a juvenile than an adult, his use of an otherwise generally standard format in his reports does not render his conclusion incredible. Moreover, the State's contention that no testimony by Dr. Garbarino could overcome the underlying flaw that he had no knowledge as to the truth or falsity of defendant's statements is incorrect. This is not an underlying flaw. An expert's opinion rarely determines the truth or falsity of the underlying claim. Rather, the

---

[2]We note that relatively standard formats are also used in other professions, including the legal profession, where attorneys and courts summarize general law before applying that law to specific facts to reach conclusions.

factual basis upon which an expert opinion rests is simply the basis for the opinion. Indeed, an opposing party may challenge that factual basis, which, in turn, may undermine the weight ultimately attributed to the opinion. In other words, the strength of the *basis* for the expert opinion impacts the court's assessment of the *weight* to give that opinion. Here, however, and as described above, there is a plethora of evidence to adequately support the court's apportioning the weight of Dr. Garbarino's opinion in defendant's favor.

¶ 52    As the postconviction court accurately summarized, defendant presented evidence from a developmental psychology expert that,

> "to a reasonable degree of psychologic certainty, defendant's experience of adversity and trauma left him at high risk of delinquent and violent behavior, and at age 18, his executive functioning was not fully developed and he had difficulty managing emotions, such that his characteristics as a juvenile should have been considered at sentencing."

In forming his opinion, Dr. Garbarino relied on information defendant provided him; but he also reviewed defendant's academic assessment, anger management program completion, disciplinary records from the DOC, and some (albeit limited) mental health medication paperwork and he independently researched and reviewed information about this case from online newspaper articles and defendant's direct appeal. Dr. Garbarino's expertise, background, and qualifications as an expert were not challenged. The court personally assessed Dr. Garbarino's credibility, and it considered that the information he relied upon was not inconsistent with the record or the presentence investigation report. Thus, we cannot find that the court clearly erred in finding that defendant established his claim by a preponderance of the evidence.

¶ 53                    C. As-Applied Constitutional Violation

¶ 54 The State argues next that, for two overarching reasons, the court erred in finding that defendant, an adult offender, met his burden of proving a substantial constitutional violation under the proportionate penalties clause, as applied to him.

¶ 55                       1. Cruel and Degrading or Shocked the Community

¶ 56 First, the State argues that the court erred where it found a constitutional violation but did not make an express finding that defendant's sentence was cruel, degrading, or so wholly disproportionate to his offense that it shocked the moral sense of the community. According to the State, defendant bears the burden of proving facts that show his particular circumstances fall under *Miller* and that his sentence is so disproportionate to the offense that it shocks the moral sense of the community. It contends that the court erred here, where it dispensed with the latter part, which it deems the crux of a proportionate penalties claim. The State notes that, in *Hilliard*, 2023 IL 128186, the court held that, for purposes of an as-applied challenge, mandatory firearm enhancements for adult offenders did not shock the moral sense of the community, and, thus, the as-applied claim raised here also required a finding that the sentence was shocking. It argues that a mandatory minimum 76-year sentence for defendant does not shock the moral sense of the community; it points out that defendant alone made the decision to bring a gun to the robbery and shoot the victim in the back of the head and the legislature has made changes to the relevant statutes, but only prospectively and, with respect to the firearm enhancements, only for persons under age 18. In sum, the State finds notable that the court did not even consider the seriousness of defendant's offense in its analysis. In the State's view, "the General Assembly's more recent enactments favoring discretionary sentences and parole for juvenile and young adult offenders do not mean that the minimum sentences imposed under the prior system, of which the legislature continues to approve[,] and courts previously found proportionate, violate the proportionate

penalties provision." Rather, it contends that defendant's as-applied claim lacks merit because his 105-year sentence simply does not shock the moral sense of the community and his crime fits squarely within the serious conduct, degree of harm, and societal dangers the General Assembly sought to address when it enacted the mandatory firearm enhancements, consecutive sentencing, and truth-in-sentencing provisions.

¶ 57    The proportionate penalties clause to the Illinois Constitution provides: "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The clause's emphasis on rehabilitative potential provides limitations on penalties beyond those afforded by the eighth amendment (*People v. Clemons*, 2012 IL 107821, ¶¶ 39-41), although there is no indication that the possibility of rehabilitation must be given greater weight and consideration than the seriousness of the offense in determining a proper penalty (*Hilliard*, 2023 IL 128186, ¶ 40). However, a proportionate penalties claim may succeed if, as relevant here, the defendant shows that the punishment for the offense is " 'cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community.' " *Id.* ¶ 20 (quoting *People v. Miller*, 202 Ill. 2d 328, 338 (2002)). Nothing specifies exactly which sentences meet this standard, because, as society evolves, so do our concepts of decency and fairness that shape the moral sense of a community. *Id.* Thus, while the legislature retains the power to prescribe penalties and mandatory sentences, even those that restrict the judiciary's discretion, the penalties must still satisfy constitutional requirements. *Id.* ¶ 21.

¶ 58    Our supreme court has recognized the potential viability of an emerging adult raising a proportionate penalties claim based on the concerns articulated in *Miller*. See *People v. Clark*, 2023 IL 127273, ¶ 87 (citing *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44, and citing *Harris*,

2018 IL 121932, ¶¶ 1, 48). This court recently summarized that, to do so, a defendant must demonstrate that his or her own individual characteristics were so like those of a juvenile that receipt of a life sentence without the *Miller* safeguards was cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community. *Garcia*, 2024 IL App (2d) 210488-B, ¶ 14; see *People v. Wilson*, 2022 IL App (1st) 192048, ¶ 87. Moreover, we elaborated that the elements of an as-applied proportionate penalties challenge to a life sentence based on *Miller* concerns require a young adult offender to

> " 'allege and ultimately demonstrate that (1) at the time of the commission of the underlying offense, his or her own specific characteristics—those related to youth, level of maturity, and brain development—placed him or her in the same category as juvenile offenders described in *Miller* and (2) his or her sentencing was not *Miller* compliant, in that a life sentence was imposed without regard for the offender's youth and its attendant characteristics.' " *Garcia*, 2024 IL App (2d) 210488-B, ¶ 15 (quoting *People v. Cortez*, 2021 IL App (4th) 190158, ¶ 47).[3]

¶ 59       As such, while an as-applied proportionate penalties claim requires a showing that the sentence is so disproportionate to the offense as to be cruel, degrading, or shocking to the moral conscience of the community, that showing is implicitly satisfied for an emerging adult offender challenging a life sentence based on *Miller* if he or she demonstrates the two aforementioned factors (individual circumstances require application of *Miller* and the original sentencing hearing lacked *Miller* safeguards). In other words, a life sentence without parole *is* shocking to the moral sense of the community if it was imposed upon an emerging adult defendant who has established that (1) the science underlying *Miller* and its progeny applies to his or her specific facts and

---

[3]The State also recites this standard in its reply brief on appeal.

circumstances and (2) his or her age and youth-attendant circumstances were not considered at the original sentencing hearing before that life sentence was imposed.

¶ 60    The State's position—that an *express* finding that defendant's sentence shocks the moral sense of the community is required—relies heavily on *Hilliard*, where the 18-year-old defendant challenged only the mandatory-firearm-enhancement portion of his 40-year sentence. *Hilliard*, 2023 IL 128186, ¶ 27. There, the court affirmed the first-stage dismissal of the defendant's as-applied proportionate penalties claim, noting that his sentence was *discretionary* and that, even with the mandatory enhancement, his sentence as an adult was less than the defined *de facto* life sentence for juveniles (*i.e.*, greater than 40 years, as delineated in *People v. Buffer*, 2019 IL 122327, ¶ 41). *Hilliard*, 2023 IL 128186, ¶ 27. Thus, even if the defendant *could* ultimately present evidence that he was more like a juvenile than an adult, *Miller* would not even apply to his discretionary, nonlife sentence. In addition, the court recognized that the legislature had determined that, while courts could use discretion regarding the enhancements for those under age 18, leaving them mandatory for a defendant age 18 or older reflected a deliberate choice, as did its decision, as a matter of policy, to allow certain, but not all, defendants who were under age 21 at the time of their offense to be eligible for parole review. *Id.* ¶¶ 38-39. Therefore, in addition to noting that defendant did not receive a mandatory life sentence, the court ultimately held that his total sentence of 40 years, given the circumstances of the case—where the defendant fired multiple shots at a victim at close range without provocation and in an attempt to kill him—was not arguably cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community. *Id.* ¶ 40. As the court found in *Hilliard* that the defendant did not receive a life sentence, such that *Miller* would apply, the only real question was whether the sentence overall

was otherwise cruel, degrading, or so wholly disproportionate to his crime as to shock the moral sense of the community.

¶ 61     Here, unlike in *Hilliard*, there is no dispute that the statutory scheme under which defendant was sentenced *mandated* that he receive a life sentence. Indeed, the mandatory minimum sentence was 76 years, although the court imposed 105 years. As constitutional as-applied claims are case specific, we do not read *Hilliard* as mandating that, in all cases—even *after* a defendant has established both that *Miller* applies to his or her individual circumstances *and* that the original sentencing hearing did not adequately account for youth and its attendant circumstances—courts must *also* make a separate, express finding that the sentence is cruel, degrading, and so wholly disproportionate to the offense as to shock the moral sense of the community. Again, we believe that a life sentence without parole *is* shocking to the moral sense of the community if it was imposed upon a young adult defendant who has established that (1) the science underlying *Miller* and its progeny applies to his or her specific facts and circumstances and (2) his or her age and youth-attendant circumstances were not considered at the original sentencing hearing before that life sentence was imposed. And, while we do not disagree with the State's argument that the General Assembly has deemed appropriate a 76-year minimum sentence for adult defendants who commit the crimes that occurred here, that argument is premised upon the defendant being an adult, with the culpability generally assigned to an adult, whereas, here, at issue is an emerging adult who established that developmentally he was more like a juvenile at the time of his crime and, regardless of the sentence he ultimately receives, he was given a life sentence without parole absent *Miller* safeguards.

¶ 62     Finally, we note that, even if the State were correct that the court was required to make an express finding that the sentence here, as applied to defendant, shocked the moral sense of the

community, the appropriate recourse would be to remand for the court to decide that question. We need not remand for that purpose, however, as we agree that the finding was inherent in the court's decision to grant defendant a new sentencing hearing because he made a substantial showing that, at the time of the offense, he was developmentally more like a juvenile than an adult and that, before a 105-year sentence without parole was imposed, his youth and its attendant circumstances were not considered.

¶ 63                             2. Parole Statute is Not Retroactive

¶ 64     Second, the State argues that the court erred by granting relief that amounts only to *de facto* retroactive application of the parole statute, which does not apply to defendant. Specifically, it notes that, if defendant were resentenced, the minimum sentence available remains 76 years' imprisonment, where the firearm enhancement is still mandatory for offenders age 18 or older, the sentences must run consecutively, and defendant must serve the entire first degree murder sentence. The State posits that there is no practical difference between a 76-year sentence and a 105-year sentence, as defendant will not likely outlive either term. Thus, the State asserts, the change in the parole statute, allowing parole review for offenders who are under age 21 at the time of their offense and have served 20 years of the sentence (730 ILCS 5/5-4.5-115(b) (West 2020)), is the *only* theoretical benefit defendant could seek at resentencing. However, that statute is not retroactive and applies only prospectively and therefore, the State argues, the change cannot support defendant's as-applied challenge. In sum, the State argues that it is error for a court to grant a *de facto* retroactive application of a statute and to affirm the court's order here would allow defendant the benefit of a statute that is expressly inapplicable to him and would override the legislature's determination that the parole statute has only prospective application. Again, we disagree.

¶ 65    First, the court expressly stated that it was making no finding about what sentencing laws, including the parole statute, will apply to a new sentencing hearing. Rather, it had assessed only that defendant satisfied his burden on the petition to warrant a new hearing. As such, because the court made no finding on whether the parole statute will apply at a new hearing, we cannot conclude that the court erred in granting relief because its relief *might* result in the application of that statute.

¶ 66    Second, we note that, in both its motion to dismiss defendant's amended postconviction petition and on appeal, the State concedes that, if given a new sentencing hearing, defendant would be eligible for a parole hearing after serving 20 years of his sentence. It contends, however, that relief cannot be granted where the sole remedy is the application of a statute that is inapplicable to him and he has not established his as-applied proportionate penalties claim. As we have disagreed with the State and have determined that it was not manifestly erroneous for the court to find that defendant did establish his as-applied claim, its argument is unavailing.

¶ 67                    D. Sentencing Hearing Not *Miller* Compliant

¶ 68    Finally, the State argues that the court erred in granting defendant's petition because, even if the *Miller* factors were applicable to defendant, defendant's original sentencing hearing was *Miller* compliant. The State notes that the sentencing court possessed the presentence investigation report, which included information about defendant's age, home life, educational background, criminal and employment history, ADHD diagnosis, substance abuse history, and "medium risk" to reoffend. It notes that, at sentencing, the State presented victim impact statements, argued that no mitigating factors applied, and suggested that the court should not feel sorry for defendant based on the presentence investigation report, because it did not reflect that he was remorseful and there were contradictions within that report that called into question the accuracy of defendant's self-

reported information. For example, according to the State, it was contradictory for defendant to report that he was "kicked out of the house" at age 14 because of his mother's boyfriend, but to also report a great relationship with his mother, in that she had been supportive of him since his arrest and he called her after the shooting. The State points out,

> "[e]ven if defendant was kicked out of the house at 14, he was not without support as he was the youngest of 25 siblings with whom he had great relationships, and he had a probation officer who recognized that defendant was a child in need when he recommended defendant for in-patient substance abuse treatment."

¶ 69　Further, the State summarizes arguments made at sentencing, including defense counsel's argument that the minimum sentence was cruel and unusual punishment, as well as the sentencing court's comments noting defendant's age "and the other factors referenced in *Miller*" throughout its findings. For example, it notes the court's comments that defendant had a "unique mind," deciding to steal marijuana by bringing and using a gun; had at least three hours to change his mind but his thought process did not change or recognize that what he wanted to do was wrong; did not respect the victim; and could have fled the scene after taking the marijuana but instead decided to pull out the gun and shoot the victim in the back of the head. The court also commented at sentencing that, while there are instances when bad things happen in seconds, "that's not this case." In addition, the court explicitly considered defendant's age in deciding that the minimum add-on was appropriate. Finally, the court rejected defendant's motion to reconsider the sentence, which had argued, in part, that the court did not adequately consider mitigating circumstances, such as his home life and mental health, his rehabilitative potential, and that the sentence was cruel and unusual for an 18-year-old offender. In rejecting the motion, the court stated that it had looked at defendant's family and personal life but that it believed "that at a young age everybody knows"

it is improper to use a gun and shoot someone in the back of the head from close range. In addition, the court noted defendant's decision to flee and cover up the crime. Thus, the State concludes, the transcripts from the court's sentencing hearing and the hearing denying defendant's motion to reconsider the sentence reflect that the hearing was *Miller* compliant because the court considered defendant's chronological age; his social, educational and criminal background "which addressed evidence of his particular immaturity, impetuosity, and ability to appreciate risks and consequences"; his family and home environment; his ADHD diagnosis and history of marijuana use; and his prospects for rehabilitation, given the "heinous" actions of executing a human being. In sum, the State argues that, for a hearing to be *Miller*-compliant, a sentencing court must have available a discretionary sentencing scheme and may not refuse to consider the defendant's youth and its attendant circumstances. *People v. Wilson*, 2023 IL 127666, ¶ 42. Those requirements were satisfied, it contends, and we should reverse the postconviction court's order. Further, the sentencing court considered all relevant mitigating factors, and this court on direct appeal rejected defendant's claim that his sentence was an excessive abuse of discretion, in part because the court had accounted for defendant's youth when it imposed the minimum enhancements. *Green-Hosey*, 2019 IL App (2d) 170110-U, ¶¶ 67-69. Thus, the State contends, the hearing was *Miller* compliant, even though it was not required to be. Again, we disagree.

¶ 70    We acknowledge that we previously determined that the sentencing court did not abuse its discretion in its sentence, where it followed the law and gave the minimum for the firearm enhancements due to defendant's youth. *Id.* However, the postconviction court's finding that the sentencing hearing was not *Miller* compliant does not implicate our former decision, as the question before it was not whether the sentencing court abused its discretion and imposed a sentence that was not within the sentencing range. Rather, the question was *Miller* compliance. In

that regard, and as the State notes, the court in *Wilson* held that a sentencing hearing is constitutionally sufficient if the sentencing court had the discretion to consider the defendant's youth and its attendant circumstances and to impose less than a *de facto* life sentence. *Wilson*, 2023 IL 127666, ¶ 44. As is undisputed here, however, the statutory scheme under which defendant was sentenced *mandated* that he receive a *de facto* life sentence[4] without the possibility of parole. In other words, the sentencing court here had no discretion to consider defendant's youth and its attendant circumstances and to impose less than a *de facto* life sentence, which we have noted is the type of discretion *Miller* contemplates. *Garcia*, 2024 IL App (2d) 210488-B, ¶ 19 (citing *People v. Campbell*, 2023 IL App (1st) 220373, ¶ 49); see *Wilson*, 2022 IL App (1st) 192048, ¶ 85 (a *Miller*-compliant sentencing hearing is designed to ensure that the defendant is not one of those rare offenders who exhibits irretrievable depravity such that no rehabilitation is possible and life without parole is justified).

¶ 71 Further, the sentencing court recognized defendant's youth and referenced it (as well as defendant's lack of criminal history) as the reason it did not impose more than the minimum firearm enhancement. At the hearing on the motion to reconsider the sentence, it commented that it also reviewed the presentence investigation report, which contained background information about defendant, his ADHD, and his family life, as well as defendant's rehabilitative potential. However, the court considered whether those circumstances impacted defendant's ability to know right from wrong, which is more akin to an insanity defense, as opposed to how concepts like right and wrong are impacted developmentally by the impetuousness of the age, the traumas in defendant's life, as well as his dysfunctional family and community surroundings. Indeed, as the

---

[4]The State asserts that the concept of a *de facto* life sentence applies only to juveniles, but the court in *Wilson*, 2022 IL App (1st) 192048, ¶ 95, rejected the State's argument.

State has acknowledged, there was information and research discussed in the postconviction proceedings that went beyond the information available in the presentence investigation report and that was not available to the sentencing court. The sentencing court was unable to consider how the information in defendant's background, for example, implicated his development, thought processes, and ability to make choices. Indeed, the sentencing court made multiple pointed comments about defendant's thought processes and calculated decisions, such as to bring the gun, but did not apparently weigh how the impulsivity or impetuosity accompanying defendant's youth impacted the *use* of the gun, where evidence reflected that there had been no plan to murder the victim. Nor was the sentencing court able to consider defendant's capacity, given his age and how his circumstances impacted his brain development, to appreciate the consequences of his actions. Finally, the court noted that it considered rehabilitative potential in the sense that it gave defendant the minimum enhancements and would not have done so if defendant had been older. However, this purported discretion had no practical effect, as even with a minimum sentence, defendant had no opportunity for anything less than a life sentence without parole. See, *e.g.*, *Wilson*, 2022 IL App (1st) 192048, ¶¶ 99-101 (rejecting the State's argument that a trial court considered *Miller* factors simply because some information touching on those factors was included in the presentence report; " 'being aware of evidence relevant to the *Miller* factors is wholly distinct from considering those factors as mitigating, or carefully considering the prospect of a defendant's rehabilitative potential' " (quoting *People v. Zumot*, 2021 IL App (1st) 191743, ¶ 40)).

¶ 72   Emphasizing the sentencing court's comments regarding defendant's thought processes and decisions, purported inconsistencies in the presentence investigation report (we disagree that they are as inconsistent as the State suggests), and the "heinousness" of executing a human being, the State suggests that the court fully considered defendant's youth and imposed a sentence it

deemed appropriate. However, *we* also find relevant the sentencing court's comments that it was "handcuffed," that it did not like the sentence it had to give defendant, that it wanted the legislature to reconsider mandatory add-ons and possibly consecutive sentencing for young adults, and that it urged the legislature to consider the evolving science regarding brain development in young adults who are not legally juveniles. Indeed, the court's comments reflect implicit recognition that it had *no discretion* to consider defendant's youth and its attendant circumstances in any meaningful way before imposing a *de facto* life sentence without parole.

¶ 73    Thus, we do not find manifest error in the postconviction court's finding that the sentencing hearing did not adequately account for defendant's youth and its attendant circumstances in the way *Miller* contemplates. We hasten to add, as we did in *Garcia*, that we are not implying that defendant is precluded from receiving the same sentence under current law. Indeed, *Miller* concerned sentencing schemes that imposed a mandatory life sentence without the possibility of parole. As the postconviction court has found that defendant's particular characteristics entitle him to *Miller* protections under the proportionate penalties clause, his sentence is properly vacated because, under the law at the time he was sentenced, there was no possibility for parole. See *Garcia*, 2024 IL App (2d) 210488-B, ¶ 21. As discussed above, however, current law contemplates that possibility. See 730 ILCS 5/5-4.5-115(b) (West 2020). Accordingly, if the court at resentencing determines that the parole statute applies, then a new sentence, whatever its length, will presumably be *Miller* compliant because defendant will be eligible for parole in less than 40 years.

¶ 74                                          III. CONCLUSION

¶ 75    For the reasons stated, the judgment of the circuit court of Kane County is affirmed.

¶ 76    Affirmed.

*People v. Green-Hosey*, **2025 IL App (2d) 240284**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 14-CF-76; the Hon. Elizabeth K. Flood, Judge, presiding. |
| **Attorneys for Appellant:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| **Attorneys for Appellee:** | James E. Chadd, Christopher McCoy, and Toni Lea Heniff, of State Appellate Defender's Office, of Elgin, for appellee. |